UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF INDIANA

CASE NO: NEW CASE

1:25-cv-00678-RLY-MG

> **FILED**
>
> **04/07/2025**
>
> **U.S. DISTRICT COURT**
> SOUTHERN DISTRICT OF INDIANA
> Kristine L. Seufert, Clerk

Jesse Holloway

Plaintiff,

vs.

Ryder Integrated Logistics, Inc.

Rockwell Automation, Inc. Defendants.

## **COMPLAINT**

1) Plaintiff Jesse Holloway a pro se litigant, brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, to redress Defendants' unlawful employment practices, seeking relief for racial discrimination, retaliation, disability discrimination and interference with protected rights under ADA and FMLA perpetrated by Defendants Ryder Integrated Logistics, Inc. and Rockwell Automation, Inc.

2) Defendants Ryder Integrated Logistics INC. (hereinafter known as Ryder) and Rockwell Automations INC. (hereinafter known as Rockwell) engaged in a pattern of discriminatory and retaliatory conduct, subjecting me to disparate treatment by means of a severe hostile

work environment, and ultimately wrongfully terminating my employment for engaging in protected activity.

## JURISDICTION AND VENUE

3) This Court has jurisdiction over this action under 28 U. S. C. § 1331 because the claims arise under federal laws, including Title VII of the Civil Rights Act of 1964 and The Americans with Disabilities Act (ADA).

4) Venue is proper in this Court under 28 U. S. C. § 1391(b) because at the events giving rise to these claims took place in Whitestown, Indiana.

## PARTIES

5) I am an African American male with a qualifying Disability, a former Customer Logistics Manager (herein after known as CLM) at Ryder's Rockwell Automation facility located in Whitestown, Indiana.

6) I was hired by Ryder Integrated Logistics on or on 04/12/2023 to work as a CLM for their startup venture with Rockwell Automation.

7) All claims arise from a common nucleus of operative facts involving my employment at a single worksite, under shared operational control by both Defendants, involving overlapping actors, events, and legal issues.

8) Defendant Ryder Integrated Logistics, Inc. is a corporate entity registered with the Indiana Secretary of State, with its principal business located in Whitestown, Indiana and is subject to Title VII and ADA.

9) Defendant Rockwell Automation, Inc. is a joint employer, exercising direct and indirect control at the Whitestown facility and is bound by their Supplier Code of Conduct to enforce compliance for its sub-contractors (Ryder) with federal law (Exhibit W).

**Administrative History**

10) I filed a charge of discrimination with the EEOC on 10/04/2024 (Exhibit 2).

a)   Charge No. 24F-2025-00009

11) I received a Right-to-Sue letter in or around 02/27/ 2025 (Exhibit 13).

**GLOBAL ALLEGATIONS APPLICBLE TO ALL COUNTS**

12) This case exposes Ryder Integrated Logistics for what it is—a repeat offender of Civil Rights violations, an employer that treats federal law as mere suggestions, and an enterprise that has normalized discriminatory practices as part of its organizational culture.

   a)   Given the factual complexity and institutional pattern of misconduct spanning multiple legal violations, this Complaint presents the necessary detail required under Rule 8(a)(2) and controlling precedent. Federal courts do not require brevity at the expense of clarity—particularly where a company has weaponized vague policy, institutional silence, and procedural manipulation to violate civil rights.

   b)   Where the misconduct alleged is not isolated but institutional, courts have repeatedly upheld fact-intensive pleadings as essential to showing pretext, joint employer liability, and pattern-or-practice claims—especially under Title VII, ADA, and post-decree retaliation frameworks

13) In *U.S. EEOC v. Kimco Staffing Services & Ryder Integrated Logistics* (C.D. Cal. 2021), the U.S. Government found Ryder liable for engaging in systemic race-based discrimination, retaliation, and the manipulation of promotion processes to exclude Black employees. The resulting Consent Decree mandated institutional reforms: requiring Ryder to revise its

promotion standards, enforce anti-retaliation protections, and submit to federal monitoring through a designated compliance officer—Maria Ruiz.

a) The 2021 Consent Decree found Ryder liable for identical conduct—retroactive job criteria (¶26), fabricated discipline (¶179), and suppressing Black advancement. Its post-Decree recurrence proves institutional bad faith.

14) Although Ryder entered into that agreement and accepted its terms, the evidence presented in this complaint demonstrates that Ryder resumed identical conduct shortly after the decree's expiration. The same denial of promotions through retroactive qualification changes, retaliatory discipline disguised as performance management, and denial of lawful compensation through non-existent policy enforcement are once again at play. These practices, now redeployed in new form, reflect not a lapse in oversight, but an intentional reversion to behavior previously found unlawful by federal authorities.

15) In this case, Ryder denied me a promotion based on retroactively imposed SAP qualifications not listed in the original job description, consistent with the pattern condemned in the Kimco decree. Ryder issued retaliatory discipline within weeks of my EEOC complaint, mimicking the same adverse action framework the EEOC found unlawful in 2021. Ryder's denial of lawfully earned overtime through an undocumented "spoken word" policy—never codified nor applied consistently—is further evidence of their willful misconduct.

a) As outlined in the 2021 Consent Decree, Ryder was found liable for manipulating promotion criteria to exclude Black employees—a practice replicated here through retroactive SAP requirements (¶26) and subjective labels like 'arrogant' (¶40).

16) Moreover, the very individual assigned to enforce federal compliance under the Consent Decree—Maria Ruiz—participated directly in the acts of retaliation, wage manipulation, and

denial of ADA accommodations against me in this case. This demonstrates not mere negligence, but a pattern of institutionalized retaliation carried out through official channels.

17) I allege that Ryder has adopted a strategic posture of superficial compliance, whereby internal policies are used selectively to justify otherwise unlawful discrimination. The company's own records, its shifting justifications, omission of adverse actions from initial position statements, and inconsistent enforcement of policy—constitute evidence of pretext under Reeves v. Sanderson Plumbing and retaliation under Burlington N. & Santa Fe Ry. v. White. These actions are not isolated incidents, but part of a recurring and federally documented pattern of misconduct.

18) I further allege that Rockwell Automation had knowledge or should have known of Ryder's federally documented history of discrimination and failed to intervene, stop, or correct the misconduct, thus reinforcing a system of complicity, policy evasion, and retaliation.

   a) Rockwell's Supplier Code (Exhibit W) mandated intervention but it ignored complaints (¶153), ratifying Ryder's misconduct under Skanska.

19) This complaint provides the necessary factual and legal foundation for this Court to determine that Ryder's ongoing practices are not merely individual violations, but components of a broader, deliberate pattern of civil rights violations, retaliation, and regulatory evasion.

### <u>COUNT I: RACIAL DISCRIMINATION (TITLE VII)</u>

20) In or around April 2024, I applied for the Logistics Manager role at Ryder's Whitestown facility, a position I was qualified for based on my experience and performance.

21) Muhammad Khan (a non-Black employee) and me were the sole candidates selected for Ryder's Leadership Development Course, demonstrating equivalent qualifications (Exhibit F).

22) The Manager Customer Logistics role (herein "LM"), as outlined in Ryder's job description (Exhibit A), emphasizes direct leadership of warehouse staff, labor execution and attainment of daily operational KPIs. My Annual Review (Exhibit O) demonstrates that I consistently met or exceeded expectations in these key areas, including leadership, coaching, shift planning and execution—directly aligning with the LM role's listed requirements.

23) While the Logistics Manager role demands hands-on warehouse leadership, logistics experience, and operational oversight, Ryder promoted Muhammad Khan a non-black internal candidate, who was not as similarly or equally qualified.

   a) Khan, a non-Black office-based employee with minimal or no direct reports, was promoted not based on qualifications, but on subjective, undocumented preferences, criteria never disclosed an unsupported by written policy.

   b) Khan lacked the minimum requirements outline in the LM role (Exhibit A).

   c) Khan no warehouse operations experience, no shift leadership experience, and no history of labor planning, personnel oversight or compliance enforcement.

   d) Khan had no history of warehouse team oversight, nor demonstrated the ability to execute or supervise daily to day floor operations in any capacity – the very core functions of the LM role, which I was already performing and have done in my career.

   e) Throughout his tenure, Khan operated exclusively in officed-based analyst roles, disconnected from the day-to-day execution and leadership type responsibilities the LM role explicitly required.

   f) Khan had no experience supervising personnel and did not engage with hourly associates on a day-to-day basis—an essential function of the LM role. His work

was limited to internal data analysis and office-based functions, with no demonstrated ability to lead, develop, or manage teams, whereas the defendants;

   i)   Promoting an individual with no people leadership exposure into a role centered around people management, while denying that same role to a Black candidate already performing those duties, can be evidence that Ryder's selection process was rooted in racial preference, not merit.

24) Despite meeting and exceeding the listed qualifications (Exhibit O), the defendants neither granted me an interview or considered my application me for the role— while a non-black candidate, was handed the role without facing a competitive process or meeting the minimum qualifications.

   a)   Defendants later weaponized Khan's analyst experience—nowhere written, stated or required by the LM role—as a post hoc justification to conceal a promotion decision rooted in bias, not merit.

25) The defendants' actions contradict their internal own EEO/Affirmative Action Policy (Exhibit E), which mandates merit-based, non-discriminatory promotions. discriminatory practices.

26) Defendants retroactively added 'SAP/Inventory reconciliation skills' as a requirement for the position, despite it being excluding it from the original job description.

   a)   Although I possess these retroactively added skills, I was denied the opportunity to compete or demonstrate my qualifications.

   b)   The Supreme Court has held that such shifting justifications can infer pretext under *Reeves v. Sanderson Plumbing*, 530 U. S. 133 (2000), and violate Title VII.

   c) Defendants retroactively added 'SAP skills' (Exhibit C)—a criterion absent from the original posting (Exhibit A) and never required for non-Black LMs (¶28), replicating the Kimco Decree's unlawful conduct (¶14).

27) Furthermore, Ryders retroactive imposition of SAP/Inventory reconciliation skills, was only revealed when compelled by the EEOC.

   a) Ryder's actions mirror the exact discriminatory conduct, they engaged in and was condemned for in the 2021 Consent Decree.

   b) There, the EEOC found that Ryder used post hoc, subjective criteria to deny promotional opportunities to Black employees, who were superiorly more qualified than the defendants preferred non-black candidates.

   c) That decree prohibited Ryder from altering job requirements or relying on ambiguous standards as a barrier to advancement.

   d) Their reversion to these tactics, less than a year after the Consent Decree expired, is not only evidence of pretext, but infers Ryder operates with a fraudulent pattern of suppressing Black advancement.

28) Logistic Managers hired and or promoted by the defendant before and after Muhammad were non-black and were not required to have SAP/Inventory reconciliation skills, such as Melissa Isbell, Samuel Gonzalez, Bryan Sheedy, James Delashmit, Michael Snyder, and Eric Wiggins.

29) Defendants, through Stephen Toms, Ryder's Group Logistics Manager, falsely claimed that our applications (internal black candidates) were "never received. " However, Ryder's recruiter, Faizal Khan, confirmed that all applications were forwarded to Toms, proving that this was a deliberate attempt to prevent qualified Black candidates from advancing (Exhibit

B)—constituting evidence of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) as;

a) Internally the defendants stated our applications were never received, a claim that was later proven false

b) Despite this internal narrative, the defendants withheld this lie from the EEOC and instead offering a post hoc, non-discriminatory justification.

c) This contradiction between internal communication, and external representations reveals the defendant's deliberate misrepresentation, inferring pretextual discriminatory intent under Reeves and McDonnell Douglas.

d) As alleged in (¶15), Ryder's false claim that I 'never applied' mirrors its prior misconduct under the Kimco Decree.

e) Toms then in retaliation summoned those of us who were making complaints to HR about his promotion decisions into a group meeting. At this meeting, Toms angrily stated we "lacked the capacity" for the promotion that we are were more qualified for over his chosen candidate.

   i) Toms blanket condemnation was made without any individual performance evaluations and was directed at a group of employes who had exercised their rights under Title VII.

   ii) Toms use of the phrase "we lacked the capacity" demonstrates not only retaliatory intent but also racially coded dismissal. It functioned as a retaliatory warning — a clear sign that challenging him would result in collective disqualification and career sabotage.

iii) Defendants later admitted, in their own EEOC response (Exhibit C), that Mr. Toms held this meeting to "speak frankly" to CLMs after they raised concerns. This admission confirms the meeting occurred in response to protected complaints and was not a part of a legitimate performance evaluation process. As such this statement serves as direct evidence of retaliatory and discriminatory animus in violation of Title VII.

30) Several months later, I reapplied for the Logistics Manager role in August 2024, having completed an additional Ryder-sponsored leadership course—further enhancing my superior qualifications.

31) I underwent two interviews, one with Stephen Toms and was passed on to another with Allen Adams a week later.

32) During my second interview in or around the first week of September 2024, Adams praised my "strong work ethics, my Leadership skills and ability to build culture", while stating a formal interview was unnecessary. We then engaged in a 90-minute conversation discussing how to improve in our facility.

33) On or about 09/09/2024, Allen Adams and Samuel Gonzalez called me into Adams' office to provide feedback as they did with similarly situated employees, where they informed them that they were denied advancement because they were not following policy or running their departments effectively. (Confirmed in Exhibit C)

34) Instead of giving me honest and subjective feedback, Adams and Gonzalez only stated, "Stephen said no, you're too arrogant", whereas;

   a) Anthony & Ibraheem who are both black, received developmental coaching, and measurable objective performance feedback—yet I—who openly voiced concerns of Tom's racial bias, and blatant favoritism—was intentionally excluded;

   b) The defendants' actions were not just racially discriminatory, but strategically retaliatory, using a racial shield while selectively punishing vocal dissent.

35) Defendants' subjective rationale lacked any objective, documented basis, constituting pretext and disparate treatment under Title VII. Their promotion criteria not only disproportionately impacted a protected class, but it also highlights a pretextual promotion process engineered to eliminate candidates perceived as noncompliant or threatening the status quo, satisfying the standard set in *Fisher v. Wayne Dalton Corp.*, 139 F. 3d 1137 (7th Cir. 1998).

36) On or about 09/11/2024, I utilized Ryders Open Door policy and escalated my concerns about being denied advancement opportunities due to racial bias to Adams and Gonzalez (Exhibit 3).

37) Gonzalez later that day told me that Adams wanted me for the role but had to defer to "His Daddy Stephen' to avoid friction".

38) On 09/12/2024 Following my conversation with Gonzalez, I escalated my concerns to Tim O'Brien (HR Business Partner)—citing a continuous pattern of racial discrimination, favoritism, and internal policy violations.

39) Tim O'Brien dismissed my complaint like other HR representatives employed by the defendants have done in the past— contradicting Ryders stated values in their EEO policy (Exhibit E), subsequently;

a) Tim O'Brien amplified and legitimized the discriminatory characterization by stating "I would hope that you understand that a candidate being "too arrogant" as part of their performance impacts their candidacy for other positions. Ryder has a set of leadership competencies…. etc. which align with our hiring practices and standard's";

   i) Rather than addressing the racially coded nature of the "arrogant" label or questioning its unwritten, unsupported usage, O'Brien institutionally validated the biased
   feedback—justifying subjective and discriminatory evaluations by referencing the leadership competency model

b) O'Brien referenced the Leadership Competency Model which purports to uphold fairness and integrity, to justify my denial—yet never explained how my alleged behavior impacted my ability to do my job, lead my team, or impacted my candidacy for the LM role—nor was I given any performance feedback or guidance on how to improve to meet future expectations.

c) In fact, I was punished for doing exactly what the defendants leadership Competency Model referenced by Tim O'Brien asked, such as;

   i) "Respectfully takes a stand to ensure what is in best interest of the organization and strategically challenge the status quo"

   ii) "Provides direct and candid feedback even in the face of tough or high-stake situations"

   iii) "Believes, acts, and speaks up on what is 'right', regardless of fear or potential outcome."

d) In comparison to the leadership competency model, I was;

      i)   Calling out unethical employment decisions

      ii)  Demanding Transparency

      iii) Refusing to Tolerate favoritism

      iv) Standing up for others, when they were scared to defend themselves

40) Unaware of the existence of this competency model, my career as a leader, was led by these principles, and is confirmed in annual review (Exhibit O), whereas;

    a)  The defendants through Stephen Toms took my performance, my advocacy for fairness, willingness to speak up or call out wrongs, all aligning with the referenced Competency Model and weaponized it against me.

    b)  Tom's use of the word "arrogant" an unmeasurable, subjective, racially motivated term, proven to be used to attack the superior qualifications of Black employees and women—and in this instance, used to call into question my character and qualifications, over his less qualified preferred candidate(s).

        i)   The 'arrogant' label, unsupported by policy (Exhibit E), mirrors EEOC findings that Ryder weaponizes subjectivity against Black employees as found in *EEOC v. Target Corp.*, No. 15-cv-01003, 2015 WL 6439422 (D. Minn. Oct. 22, 2015).

    c)  O'Brien referencing the leadership competency model, just further solidifies that Ryder's polices or 'standards' are nothing more than a performative window dressing, corporate smokescreens designed to give the illusion of fairness, while masking their racial bias, as they have no clue exactly what lies inside them.

41) While I was denied the Logistics Manager position despite meeting and exceeding all qualifications define, Defendants promoted another non-Black employee who was not equally or more qualified.

42) James Delashmit, a severely less qualified white employee, was promoted over me despite:

    a)  Not meeting any of the requirements of the Job role (Exhibit A).

    b)  Not meeting the unwritten, retroactive SAP/Inventory reconciliation skills, the defendants stated "aligned" with the role—used post hoc, under scrutiny from the EEOC.

    c)  Engaging in a reported sexual relationship with a subordinate that was known to management, prior to him applying for the role (Exhibit 41).

    d)  Creating a hostile work environment through favoritism and overly aggressive confrontational behavior towards Black employees (Exhibit 41).

    e)  Having to be reassigned from the Auto-Store department, a high-visibility assignment requiring advanced operational expertise, multi-location coordination, and demonstrated leadership competence, to the Shipping department with not as much demand and —diminished responsibility.

        i)  Subsequently, Ryder insulated Delashmit with six tenured Team Leads upon transfer, who ran the day-to-day operation—giving him freedom to appear competent.

43) Ryder willfully engaged in my disparate treatment, by denying advancement opportunities based on unwritten and subjective requirements, then shifting these same unwritten and subjective requirements for those similarly situated, not of my protected class.

44) Ryder's pattern of conduct establishes a prima facie case of glass ceiling discrimination and pretextual discrimination in violation of Title VII.

a) The defendants' behavior demonstrates a systemic barrier to the advancement of black employees within the corporation and perpetuates the racial disparity in higher leadership roles.

b) Under the McDonnell Douglas framework, Defendants violated Title VII by promoting Delashmit, a severely less qualified non-Black employee, over more qualified Black employees.

45) Before James applied for the role, reports about him receiving preferential treatment, and his unethical conduct were made to HR, such as;

a) Kokouvi Kpomblekou (herein "KK"), a 2nd Shift Shipping Lead, reported that Delashmit confronted him aggressively regarding a workplace complaint—not as a neutral supervisor, but while engaged in a sexual relationship with the very associate who had made the complaint against KK. This undisclosed conflict of interest rendered Delashmit incapable of impartial leadership, and his conduct created a retaliatory and hostile environment for KK;

b) KK and the other Team Leads consistently maintained the shipping platform's operations, as James and his direct supervisor, Melissa, were routinely absent for extended periods of time—taking multiple unscheduled breaks and frequently disappearing together during core operational hours. — this was also reported to the defendants;

c) It was during this time, James engaged in an undisclosed sexual relationship with a subordinate, Anahi, raising clear concerns of favoritism, ethics violations, and supervisory misconduct. Despite these apparent conflicts of interest and derelictions of duty, Ryder took no action to investigate or discipline any of the individuals involved.

d) KK initially reported the misconduct to both Allen Adams and Stephen Toms, but the concern was ignored—reflecting their ongoing favoritism toward Delashmit. As the behavior persisted, KK brought the situation to my attention, in which we escalated to HR, whereas;

   i) Prior a Black Team Lead was immediately suspended and terminated for engaging in same conduct—yet Delashmit, a white male, was protected, shielded from investigation, and ultimately rewarded. This blatant double standard demonstrates not only a discriminatory application of Ryder's policies, but also a racially biased enforcement structure where Black employees are punished and white employees are protected, even when the misconduct is identical or more egregious

46) The defendants then cloaked their racial animus by awarding Delashmit "Employee of the Month" (Exhibit 17), painting a false narrative of his operation competence to cover for his lack of experience for his pending promotion, such as;

a) Defendants entered damage control in response to allegations of Delashmit's misconduct—not by investigating or correcting the behavior, but by publicly celebrating him, issuing recognition that falsely framed him as a model of integrity;

b) This image rehabilitation occurred despite serious, reported conduct that mirrored or exceeded that of a Black Team Lead who was immediately suspended and terminated;

c) Ryders attempt to rewrite history and silence the truth further demonstrates their systemic bias and preference for protecting non-Black employees at the expense of more qualified Black candidates, in violation of Title VII—reflecting a clear pattern of racial discrimination and favoritism, as established by *Lewis v. City of Chicago*, 560 U.S. 205 (2010).

      i) Delashmit's promotion, despite not meting basic the requirements listed and his reported misconduct, demonstrates the defendants practice of intentionally manipulating their internal policies and applying different standards to non-Black employees—mirroring the Global Allegations section, where subjective evaluations are not used to assess performance, but entrench discrimination.

47) In or around October 2024, following Delashmit's termination, the Logistics Manager (LM) role reopened. I, along with other qualified Black employees, reapplied. Despite meeting or exceeding the qualifications outlined in the LM job description, I was once again denied consideration—without feedback, justification, or transparency, subsequently;

    a) Ryder selected yet another external, non-Black candidate, continuing its pattern of excluding Black employees from advancement opportunities even when internal candidates were qualified;

    b) Reflecting racial gatekeeping, mirroring the same discriminatory practice, Ryder was punished for stated Globally (¶¶12-19).

48) On or about 10/11/2024, I followed up with Fazial Khan (recruiter) to inquire about the "not in consideration" status of my internal application. While Khan had previously been communicative and responsive, he failed to respond entirely, an abrupt and uncharacteristic shift that strongly suggests he was instructed not to disclose information regarding my candidacy.

    a) This deviation from past behavior further supports the inference that Ryder was actively concealing promotion decisions and suppressing transparency in retaliation for my prior complaints and EEOC activity.

49) On or about 10/14/2024, I approached Samuel Gonzalez to inquire about the rejection of my application, as he had previously encouraged me to reapply again, despite openly acknowledging Stephen Toms' racial bias and personal animosity toward me.

50) When I asked why my application was denied, Gonzalez responded, "Your Daddy"—referring to Stephen Toms—said nothing's changed." I replied, "What, my skin complexion?"

Gonzalez laughed and responded, "Well I'm not getting the Senior role because I'm Mexican.", inferring that;

  a) Gonzalez's statement confirms that racial identity was a determinative factor in promotional outcomes, making Ryder's practices not only discriminatory in effect, but discriminatory in acknowledged intent.

51) On or about 10/16/2024, I formally requested feedback from Stephen Toms regarding the repeated denials of my promotion, specifically seeking transparency and an explanation aligned with Ryder's Leadership Competency Model—the very standard Tim O'Brien previous identified as the benchmark for their leadership.

52) Rather than providing written performance feedback as required by the defendants own internal policies and had consistently been practiced with similarly situated employees, Stephen Toms deliberately evaded and instead demanded an in-person meeting, in contrasted to;

  a) Deviating from protocol directly contradicts Ryder's standard performance management process, which require leaders provide constructive, documented feedback to promote employee development by providing them opportunities (areas for improvement);

b)  Similarly, Anthony and Ibraheem, received coaching and objective evaluations, while I was singled out and denied any of those things. Toms' insistence on an undocumented, private conversation was not only procedurally irregular—it was an intentional tactic designed to avoid accountability, suppress evidence, and insulate Ryder from future liability;

c)  By refusing to document his feedback, Toms effectively evaded transparency and undermined my ability to contest vague or post hoc critiques, thereby preserving his ability to shift narratives whenever challenged;

d)  This conduct contradicts Ryder's stated Equal Employment Opportunity Policy (Exhibit E), and Leadership Competency Model, and mirrors the kind of arbitrary, untraceable decision-making patterns condemned in *EEOC v. Target Corp.*, as Tom's actions created a performance review process that was intentionally opaque, selectively enforced, and weaponized against me alone, further confirming retaliatory and discriminatory animus.

53) After Ryder repeatedly dismissed my concerns and continued to condone Stephen Toms' pattern of discriminatory and retaliatory behavior, I escalated the matter to Rockwell Automation, by submitting a formal ethics complaint.

54) Rockwell Automation deliberately ignored my discrimination allegations, constituting a failure to act contradicting their Supplier Code of Conduct (Exhibit W)— requiring their sub-contractors (Ryder) to uphold their stated principles of anti-discrimination and address and prevent unlawful violations, therefor;

    a) Rockwell's failure to act, despite their contractual duty to ensure ethical and nondiscriminatory practices, makes them jointly liable for the retaliatory harm and systemic discrimination that followed.

55) I then went to the Indiana Civil Rights Commission who then filed a charge of discrimination with the EEOC on or about 10/04/2024 (Exhibit 2).

56) Shortly after I filed my EEOC charge, Ryder produced its first Position Statement in November 2024 (Exhibit C), where—for the first time—they officially alleged I was "arrogant" and "unprepared." Prior to that filing, I had never been given any such feedback, despite repeatedly requesting evaluations and transparency regarding my promotion denials.

57) The timing of this "feedback" is not coincidental, it is retaliatory. Ryder manufactured a non-discriminatory explanation only after being compelled to justify their actions to a federal agency. This contradicts their own policies requiring timely and constructive feedback for performance development and exposes the Position Statement as a post hoc defense—not a legitimate performance review.

58) Courts have proven that, the term "arrogant," is a well-documented racial dog whistle, and if not supported by any written records, coaching, or can serve as pretext; considering;

    a) I had received consistent praise for my leadership and performance, and Ryder had invested over $500 in my professional development by enrolling me into 2 leadership courses, an investment typically reserved for high-potential candidates;

    b) This directly contradicts Defendants' later claims that I lacked leadership readiness and exposes their justification as retaliatory pretext rather than a legitimate assessment;

    c) I further allege, as a CLM it is standard practice when denying internal applicants, to give the candidate constructive feedback to help in areas in need of

improvement—However, when I was denied the opportunity for advancement on multiple occasions, I was not given any feedback, and it denied me the opportunity to address what the defendants perceived as my shortcomings.

59) Ryder also stated that I was "unprepared", but their frivolous statement, contradicts their decision to advance me to a second interview, I can confirm;

   a) As a CLM, I was directly involved in Ryder's hiring process, and I can state unequivocally that no candidate has ever advanced to a second interview if their first interview is inadequate.

   b) Advancing a candidate to further stages of consideration inherently signals that the initial interview met or exceeded baseline expectations.

   c) Therefore, Defendants' claim—submitted to the EEOC—that I was "unprepared" in my interviews yet still advanced, is not only implausible, but it also directly contradicts their own hiring protocols and internal practices.

60) Contrary to Defendants' characterization, my second "interview" was not an evaluative screening—it was a 90-minute strategic discussion with Allen Adams focused on warehouse performance, operational improvements, and progress assessments since the facility's start-up. The conversation centered on my leadership role, problem-solving initiatives, and floor-level execution—not hypothetical questions or behavioral assessments typical of interviews—confirming;

   a) A high level of trust and recognition of my operational command—not the conduct of someone "unprepared." Defendants' misrepresentation of this discussion as a failed interview is a deliberate distortion of fact, designed to justify a discriminatory denial that could not otherwise be explained.

61) Ryder's first Position Statement (Exhibit C) labeled me "arrogant" and "unprepared"—terms which appear nowhere in my performance history, evaluations, or any contemporaneous record. These personality-based critiques are racially coded, subjective, and legally recognized as proxies for bias set in *Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997) (en banc). The "unprepared" label was never previously documented and contradicts earlier praise I received from my former managers, as well as my strong performance record outlined in my Annual Review (Exhibit O).

62) Further, this sudden critique was only introduced after I filed my EEOC charge—proving it was a post hoc, retaliatory justification, not legitimate feedback.

63) Ryder never mentioned this assessment of me, prior to the EEOC investigation, despite my repeated requests for feedback and transparency, inferring;

a) A pattern of discriminatory behavior that was condemned prior, where the defendants used manipulated job criteria to block Black employees from advancement;

b) The defendants are once again, relying on racially coded, subjective, and non-measurable criticisms—such as labeling me "arrogant"—to justify adverse actions, consistent past practices, of branding Black employees as "too vocal," "too aggressive," "unpolished," or "not a cultural fit.";

c) Where these terms are not defined in any internal policy, evaluation metric, or leadership model, and are used almost exclusively to disqualify Black candidates, while non-Black counterparts are evaluated with objective standards or simply excused entirely.

64) Rockwell Automation, as the client and contracting authority for this start-up facility, had a duty to ensure Ryder's compliance with anti-discrimination policies outlined in Rockwell's

own Supplier Code of Conduct (Exhibit W), which mandates equal opportunity, nondiscrimination, and fair treatment of all workers. By entering a contractual relationship with Ryder, Rockwell assumed a legal and ethical obligation to monitor employment practices at the site it controlled

65) Despite being notified, verbally and in writing—of Ryder's discriminatory promotion practices, including concerns about pretextual selection criteria, the exclusion of qualified Black employees, and inconsistent leadership evaluations, Rockwell took no meaningful corrective action. Their willful inaction and continued endorsement of Ryder's practices render Rockwell tacitly complicit in maintaining a racially hostile work environment and violating their own supplier standards and federal law.

**Legal Conclusion for Count I (Title VII Racial Discrimination)**

66) Based on the foregoing allegations and applicable legal precedents, I respectfully requests that this Court find the following for Count I in the proceeding paragraphs.

67) The defendants violated Title VII of the Civil Rights Act of 1964 by systematically denying me—a qualified Black employee—promotion to the Logistics Manager (LM) role in favor of less qualified non-Black candidates, applying subjective and shifting criteria, and perpetuating a discriminatory glass ceiling.

68) I established a prima facie case under McDonnell Douglas Corp. v. Green;

   a) I am member of a protected class (Black):

   b) I was qualified for the LM role, as demonstrated by:

   c) Consistently exceeding performance metrics in leadership, shift execution, and labor management (Exhibit O):

    d) Direct alignment with the LM job description's core requirements (Exhibit A).

    e) Selection for Ryder's Leadership Development Course alongside Muhammad Khan (Exhibit F), confirming equivalent eligibility.

    f) I was denied promotion despite superior qualifications.

    g) Ryder promoted non-Black employees (Khan, Delashmit) who lacked my warehouse leadership experience, personnel oversight, and operational competency, key requirements for the LM role.

69) Ryder's proffered justifications are pretextual under Reeves v. Sanderson Plumbing, whereas;

    a) Shifting Criteria: Retroactively adding "SAP/Inventory reconciliation skills" (Exhibits A vs. C) after the EEOC inquiry—a tactic condemned in EEOC v. Kimco & Ryder (2021 Consent Decree). Non-Black LMs (e.g., Isbell, Gonzalez) were never held to this standard.

    b) Subjective Bias: Labeling me as "arrogant" (a racially coded trope) with no measured or comparable documentation, while excusing Delashmit's documented misconduct (Exhibit 41).

    c) Procedural Irregularities:

        i) Falsely claiming my application was "never received" (Exhibit B);

        ii) Refusing to document feedback post-denial, violating Ryder's stated standards and internal mandates;

        iii) Advancing me to a second interview while later alleging I was "unprepared"—a contradiction exposing pretext;

70) Ryder's conduct reflects systemic discrimination, as evidenced by;

a) Disparate Treatment: Promoting Khan (no leadership and or day to day labor planning experience) and Delashmit (extreme misconduct, no SAP skills, lack of leadership experience) over me despite their deficiencies in core LM functions.

b) Pattern and Practice: Replicating prior condemn violations of federal law by manipulating job criteria to exclude Black employees.

c) Retaliation: Fabricating critiques ("arrogant," "unprepared") only after I filed an EEOC charge (Exhibit 2).

71) Rockwell Automation is jointly liable for failing to enforce its Supplier Code of Conduct, enabling Ryder's discriminatory practices despite actual knowledge of complaints. As Ryder's partner, Rockwell had a duty to monitor, correct, and report discriminatory practices. Instead, they turned a blind eye to repeated, well-documented complaints. Their silence is complicity—and under agency principles and joint employment doctrine, they share full liability for the resulting harm.

## COUNT II: DISPARATE TREATMENT & HOSTILE WORK ENVIRONMENT (TITLE VII)

72) Defendants subjected me, a qualified Black employee, to disparate treatment and a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

73) I was subjected to disproportionately harsh discipline compared to similarly situated employees, both white and Black—who engaged in comparable or more severe conduct. While I was penalized, those employees were protected, excused, or faced no disciplinary action at all.

    a) This unequal treatment reflects selective enforcement of policy and establishes a clear pattern of disparate discipline, in direct violation of Title VII and Ryder's own anti-retaliation and equal opportunity policies.

74) Stephen Toms created "engagement call outs" (Exhibit K), meant for raising operational issues. Yet when I used it, I was accused of being unprofessional and hostile, while similarly situated peers, both white & black peers who did the same faced no consequences at all.

75) Toms routinely scrutinized my behavior, singled me out publicly, and criticized me in ways he never did to similarly situated employees

76) In July 2024, Megan Nouvertne was terminated shortly after reporting harassment. Her story mirrors mine exactly:

    a) Reporting a hostile environment;

    b) Being isolated;

    c) Being targeted for unwarranted disciplinary actions;

    d) Wrongful termination

77) I've seen this pattern up close, as anyone who raises concerns about unlawful conduct is immediately labeled a problem, stripped of credibility, and subjected to scrutiny until they either quit or get pushed out.

78) Ryder does not take employees complaints seriously, instead they are reviewing the scope of your submitted evidence to assess how much risk is as play.

79) After the EEOC charge filed on or about 10/04/2024, I was issued a Final Written for my first ever offense of any kind (Exhibit L).

    a) That final wasn't about my performance or conduct it was retaliation.

80) The Final written stated that Rockwell was unhappy with a comment I made during the Physical inventory and demanded Ryder hold me accountable.

81) Ironically, in or around June 2024, Zach Doyle a CLM (Caucasian) who was working with Rockwell on a project, used vulgar language while talking negatively about another manager in front of them and was not subjected to any adverse actions a severe as mine if any.

82) In or around June 2024, Allen Adams had a stand down with us managers and informed us of the incident with Zach and Rockwell and told us to be mindful of our language when talking directly to the customer, because they are always around and aware.

    a)  Rockwell demanded my discipline (Exhibit L) but ignored Doyle's misconduct—proving joint employer control and racial animus.

83) HR Business Partner Theresa Brummett made is abundantly clear, when she Stated that there is a new discipline deadline policy we must abide by, and that discipline must be issued within 7 days of the incident, or you must start over with a verbal (Exhibit J). — My Final Written contradicted this policy.

84) On or about 06/19/ 2024 Anthony Akinade another CLM locked a temporary associate in the building as he left for the night, The associate was not discovered until the next shift arrived a few hours later.

85) Considering that this incident;

    a)  Constitutes a major safety/ policy violation;

    b)  Clear breach of OHSHA regulations, as the doors were deliberately locked with a nonmember of management imprisoned inside.

86) Yet, Anthony a similarly situated employee was not subjected to any adverse employment actions as severe as mine, if any (Exhibits 15&16).

87) Hycenth another similarly situated CLM, forged an employee's signature on a document because they were overpaid, leading to the employee wages to be garnished without his consent or knowledge, subsequently;

    a) When he found out what happened it was reported to HR;

    b) An offense which is grounds for immediate termination;

    c) Yet, he was not subjected to any adverse actions as severe as mine.

88) Justin a similar situated non-Black employee referred to his team members as Bitches, and did not receive any adverse actions as severe as mine.

89) On or around November 19th, 2024, Gonzalez informed me, that Adams told him, he intends to meet with Stephen Toms and tell him to "lay off Jesse.", inferring;

    a) Adams directly acknowledging the ongoing racial bias, disparate treatment, abuse of authority and targeted hostility I was being subjected to;

    b) This statement serves as internal confirmation that Ryder leadership was fully aware I was being unfairly targeted and harassed yet chose to address it informally rather than intervene through proper channels, if they did at all.

90) On or around November 2024, Toms informed the Logistic Managers and Allen Adams that Customer Logistic Managers could be transferred to other departments if agreed upon.

91) Adams, Gonzalez, and others wanted to move me because I'd rebuilt a department from the ground up, brought culture, structure, and results, Yet Toms only exempted me from being in consideration.

92) The defendants created a workplace that was openly hostile, racially discriminatory, and retaliatory. I was held to a different standard than my peers, publicly humiliated, defamed, and isolated, ultimately punished not for my conduct—but advocacy for fair treatment.

93) What I experience wasn't workplace tension, it's was racism. It mirrors the exact conduct outlined globally (¶¶12-19).

a) The same hostile conduct occurred within 6 months of federal oversight expiring proving that Ryder did not reform, it simply got better at masking discriminatory intent.

b) Their reactivation of these practices following the expiration the Consent Decree is evidence of institutional tolerance for racial discrimination, a hostile workplace culture, and the absence of any meaningful corrective action ratified by Rockwell's tacit liability.

**<u>Legal Conclusion for Count II</u>**

94) Based on the foregoing allegations and applicable legal precedents, I respectfully request that this Court find the following for Count II in the proceeding paragraphs.

95) The defendants, Ryder and Rockwell, subjected me to disparate treatment based on race and protected activity by enforcing harsher disciplinary measures against me, while excusing or ignoring similar or more severe conduct by non-Black, non-disabled, and non-accommodated employees. This conduct violates Title VII, which prohibits discrimination in the terms and conditions of employment based on race and retaliation for engaging in protected activity.

96) I was subjected to unwarranted corrective actions, public shaming, as well as being labeled unprofessional while similarly situated employees were not disciplined for comparable or worse conduct. This disparate treatment demonstrates discriminatory intent under *Rudin v. Lincoln Land Community College*, 420 F. 3d 712 (7th Cir. 2005), which holds that inconsistent

application of disciplinary policies can evidence discrimination.

97) Defendants' actions, including public shaming, isolation, and verbal abuse, created a hostile work environment that was severe and pervasive enough to alter the conditions of

employment, in violation of Title VII under *Harris v. Forklift Systems, Inc.*, 510 U. S. 17

(1993) in which;

    a)  The conduct I endured including coded racial language, selective enforcement of policy, retaliation for protected activity, and the weaponization of Ryder's disciplinary system—constitutes a pattern of hostility that was already condemned prior and should be recognized as a continuation.

98) The defendants selectively enforced their "7-day disciplinary policy" by issuing a Final Written Warning way beyond the alleged date of the alleged incident, while consistently apply the policy standard to similarly situated employees who engaged in fraud, safety violations, and unprofessional conduct, whereas;

    a)  Zach Doyle, a similarly situated CLM, used vulgar language while talking negatively about another manager in front of Rockwell and was not issued a final written;

    b)  Anthony Akinade, another similarly situated CLM, locked a temporary associate in the building overnight, a serious safety violation, was not issued a final written (Exhibit 15-16);

    c)  Hycenth, a similarly situated CLM, committed fraud, by forging an employee's signature to garnish his wages, a terminable offense, was not disciplined as severely as me;

    d)  Justin was allowed to call his associates Bitches and was not punished nearly as severe as me.

99) The defendants email communications and internal policies contradicts the adverse actions levied at me. Similarly situated employees received progressive discipline as part of the

defendant's "standard practice", while I was strategically issued a Final Written Warning for a first-time offense, inferring;

    a) That this deviation from Ryder's Discipline policy (Exhibit 1) mirrors Hobgood's condemnation of retaliatory shortcuts.

100) Ryder issued a Final Written Warning shortly after I filed my EEOC charge on 10/04/2024, which infers retaliatory intent under *Clark County School District v. Breeden*, 532 U. S. 268 (2001) and *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U. S. 53 (2006) (34-day retaliation timeline).

101) The defendants' failure to address my complaints of harassment and hostile working conditions, while allowing me to be targeted and subjected to the selective discipline, contradicts their internal policy on Anti-Retaliation (Exhibit G) and violates their contractual agreement with Rockwell—supporting a finding of disparate treatment, mirroring;

    a) *EEOC v. Kimco Staffing Services & Ryder System*, Inc., where Ryder failed to document or investigate complaints of discrimination and relying instead on post-hoc narratives to obscure their misconduct:

    b) Similarly to the victims who came forward in EEOC v. Kimco Staffing Services & Ryder System, Inc., I experienced discriminatory treatment that followed the same illegal patterns:

        i) Subjective performance labels applied disproportionately to a Black employee,

        ii) Exclusion from advancement opportunities despite superior qualifications,

        iii) Retaliation for raising legitimate complaints.

        iv) Escalated disciplinary actions, outside their standard practice.

102)    I further allege, just like those victims, I wasn't judged on merit—I was targeted, gaslit, and ultimately punished for not staying silent, as Ryder's conduct in my case is consistent and a direct continuation of unlawful conduct, proving that nothing changed after federal oversight—except their ability to hide it better.

103)    Rockwell Automation, in its role as a joint employer, observed this misconduct, received complaints, and took no corrective action, thus ratifying Ryder's actions through silent endorsement and inaction. Their tacit approval and ongoing partnership with a known Title VII violator constitute joint liability under prevailing federal law.

## COUNT III: RETALIATION (TITLE VII)

104)    Throughout my employment, I maintained a clean disciplinary record and consistently met or exceeded expectations, even while raising good-faith concerns regarding racial discrimination, disability discrimination, and unethical conduct internally.

105)    On 10/04/2024, I filed a charge with the Equal Employment Opportunity Commission, engaging in protected activity granting protections under Title VII.

106)    Just 34 days after filing my EEOC complaint, Ryder issued a Final Written Warning on 11/08/2024—my first disciplinary action of any kind. This action violated multiple internal policies, including Ryder's 7-day disciplinary mandate (Exhibit J), and its standard Discipline policy, which mandates escalating stages (Verbal → Written → Final Written Warning) (Exhibits 1), compared to;

    a)  Similarly situated employees who did not engage in protected activity received progressive discipline for more severe infractions, if disciplined at all;

b) This procedural deviation mirrors the unlawful conduct found in *Hobgood v. Illinois Gaming Board*, 731 F.3d 635 (7th Cir. 2013)—where skipping disciplinary steps for protected activity was evidence of retaliation.

107) Ryder alleged that this discipline was issued at the request of Rockwell Automation, thereby demonstrating Rockwell's joint employer liability and control over Ryder's disciplinary practices, confirming;

a) Ryders's assertion that Rockwell had input into my discipline confirms their influence over my terms and conditions of employment.

108) I further alleged that, the defendants selectively enforced its disciplinary policy, inconsistently applying it across employees., whereas;

a) In one example, an employee who committed repeated safety violations was still afforded progressive discipline prior to receiving a Final Written Warning (Exhibit 100);

b) Compared to me being immediately escalated to a Final without prior incidents—demonstrating a deviation and inferring retaliative intent.

109) The adverse action taken against me shortly after engaging in protected activity further satisfies the elements of *Rudin v. Lincoln Land Community College*, which held that retaliatory animus can be inferred where adverse action follows closely on the heels of protected activity.

110) Ryder terminated my employment on December 18, 2024, via a phone call from Allen Adams, who stated only that I was being terminated for "insubordination," without providing any details about the alleged conduct, whereas;

a) The vagueness of this explanation, combined with my previously clean record, supports an inference of pretext and retaliation;

b) It bypassed our standard practice in which you are suspended pending an investigation;

c) Once a decision is made, you are contacted and explained what led up to your termination;

111) I further state to this court that at the Whitestown facility, retaliation was common under Stephen Toms. As I personally witnessed HR Partner Theresa Brummett and Allen Adams issue a Final Written Warning to Megan Nouvertne after she reported workplace harassment—discipline that was based solely on allegations made by Mike Snyder, the very manager she had accused of misconduct— Furthermore;

a) Megan's harassment complaints were ignored for months, just as mine were.

b) Ryder's consistent pattern of disciplining those who engage in protected activity, rather than addressing the misconduct they report—demonstrates a systemic failure.

c) *Under Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), employers are strictly liable when supervisors take adverse action in response to protected complaints, as:

i) My Final Written Warning and subsequent termination were tangible employment actions taken by supervisory personnel shortly after I filed complaints against them, triggering full liability.

112) On 11/11/2024, just seven days before my termination, Ryder issued "Good Faith" payments to me, allegedly to address unpaid overtime wages that I had been reporting for months. These payments served as a tacit admission that Ryder had ignored my wage complaints and were timed strategically to mitigate litigation risk—further supporting an inference of retaliatory motive.

113)    I had been the only Customer Logistics Manager consistently required to work overtime without compensation, in violation of Ryder's internal wage policy (Exhibits T). Despite repeatedly reporting this to members of management such as Allen Adams, and ben Ramirez and then HR, who refused to address it.

114)    In Ryder's initial EEOC position statement submitted in November 2024 (Exhibit C), they made no reference to any misconduct, performance issues, or unprofessional behavior on my part. It wasn't until after my termination and amended EEOC charge, that they submitted a second position statement in February 2025 (Exhibit D), now alleging I was fired for "unprofessionalism."

115)    The defendant's narrative shift is a textbook example of pretext under *Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000), confirming;

   a) These fabricated post-termination claims contradict not only their original statement but also my Annual Performance Review (Exhibit O), which shows I was meeting or exceeding expectations.

   b) The abrupt shift from praise to character assassination, unsupported by prior documentation, demonstrates clear retaliatory animus.

116)    Defendants further undermined their credibility when they eventually terminated James Delashmit and Mike Snyder for policy violations, both individuals I submitted internal complaint about. Though the defendants labeled my reports as "unsubstantiated" (Exhibit C), yet their terminations directly confirm the legitimacy of my complaints, where;

   a) As held in *Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008), such delayed disciplinary action supports a finding of pretext and institutional retaliation.

117)    The defendants' tactics mirror *Hobgood*, where the court held that fabricating

misconduct and deviating from standard practices to punish protected activity is compelling evidence of pretext. Here, the defendants knowingly departed from their own disciplinary standard, manufacturing baseless allegations, after I engaged in protected activity, as they knowingly submitted false statements during administrative proceedings.

118)     On November 19, 2024, just 11 days after issuing the Final Written Warning—HR circulated a document titled "Risk Questions for Managers" (Exhibits 49–50). This internal memo instructed managers to evaluate "risk factors" when considering terminations, including protected activity such as EEOC charges, accommodation requests, and FMLA leaves.

119)     This document shows that;

   a)  Stephen Toms attempted to terminate me in retaliation for protected activity;

   b)  Ryder knew his intent was unlawful and sought to control the damage by issuing scripted risk guidance;

   c)  There was corporate-level coordination in retaliating against protected employees.

*120)*     These documents satisfy the "but-for" causation standard under *Univ. of Texas SWMC v. Nassar*, 570 U.S. 338 (2013), and constitute direct evidence of retaliatory motive. The defendant's internal policy (Exhibit G) prohibits retaliating against employees for protected conduct.

121)     Ryder's retaliatory conduct is not new, their treatment of me mirrors the same behavior documented in *EEOC v. Kimco Staffing & Ryder*, where employees who reported discrimination were disciplined and terminated instead of protected.

a)  The recurrence of these tactics after the expiration of the Consent Decree demonstrates Ryder's continued institutional tolerance for retaliation.

122)    In or around November 2024, I contacted Rockwell Automation to inquire about their role in my Final Written Warning. I was informed that they were not responsible for Ryder's treatment of employees. This denial contradicts Rockwell's own Supplier Code of Conduct, which mandates oversight and accountability over labor practices, especially those involving retaliation, discrimination, and ethics violations.

### **Legal Conclusion for Count III (Retaliation Under Title VII)**

123)    Based on the foregoing allegations, documented exhibits, and binding legal precedent, I respectfully request this Court find that the Defendants retaliated against me in violation of Title VII of the Civil Rights Act of 1964.

124)    I engaged in protected activity when I filed an EEOC charge on or about 10/04/2024.

125)    Within 34 days, Defendants issued me a Final Written Warning, for my first disciplinary action ever—on or about 11/08/2024, contradicting several of their progressive discipline standards (Exhibits 1 and 100) and the 7-day discipline issuance deadline (Exhibit J).

126)    Thirty-nine days later, I was terminated without explanation, this tight sequence of events satisfies the "but-for "causation standard established in *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), which requires showing that the adverse employment action would not have occurred but for the retaliatory motive.

127)    The Final Written Warning and subsequent termination were not only procedurally irregular but were selectively and inconsistently applied. Other similarly situated employees, including Hycenth, Justin, Zack Doyle, and Anthony Akinade, engaged in more serious infractions, yet were either not disciplined or received lesser, progressive consequences. The

stark difference in treatment underscores retaliatory animus and eliminates any claim of legitimate business justification.

128)     Ryder's internal documentation further confirms this motive. Their November 2024 "Risk Questions for Managers" memo (Exhibits 49–50) instructed managers to weigh protected activity, accommodation requests, and EEOC charges before terminating employees. This document, circulated just 11 days after my inquiry about my Final Written Warning, inferring retaliatory coordination at the corporate level attempting to mask Stephen Toms unlawful intent.

129)    It also demonstrates Ryder's awareness of the legal risks associated with my termination, strengthening causation under Nassar and satisfying the evidentiary burden for pretext under *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

130)     The shifting justifications offered by Defendants further expose their pretext. Their initial position statement made no reference to any misconduct or professionalism concerns. Only after my termination did they fabricate allegations of insubordination, "badmouthing management," and "unauthorized hiring"—none of which appear in any pre-termination documentation or performance reviews— where;

   a)   Such after-the-fact rationalization is precisely the type of post hoc reasoning Reeves condemns.

131)     The issuance of "Good Faith" payments just one week before my termination—after months of ignored wage complaints, serves as additional circumstantial evidence of retaliatory motive. These back payments were not issued out of policy compliance but as last-minute damage control, designed to reduce litigation risk. Timing alone, combined with the unresolved FLSA violations, supports an inference of intentional retaliation.

132) The retaliation I endured is not isolated. Megan Nouvertne, another employee who engaged in protected activity, was similarly issued retaliatory discipline based on accusations from her harasser, then later terminated. This mirrors Ryder's systemic and institutional practice of punishing whistleblowers while shielding those who engage in discrimination or harassment.

133) Defendants' conduct reflects a pattern or practice of retaliating against employees who assert their civil rights, consistent with the findings in their 2021 Consent Decree, where Ryder was ordered to implement anti-retaliation training, complaint procedures, and accountability mechanisms—including the oversight of EEO Coordinator Maria Ruiz—to prevent recurrence of precisely this kind of misconduct.

134) The fact that Ryder retaliated against both me and Megan within months of the Consent Decree's expiration in 2023 proves that the company did not reform—it simply paused until the federal spotlight dimmed. Its failure to audit disciplinary decisions, train supervisors like Stephen Toms, or empower its EEO Coordinator to intervene, demonstrates willful noncompliance and reckless indifference to federal law.

### COUNT IV: VIOLATIONS OF THE (ADA)

135) I am a cancer survivor and, under the Americans with Disabilities Act (ADA), I qualify as an individual with a disability. Beginning in July 2024, Ryder approved my reasonable accommodation, including modified work hours by means of intermittent FMLA.

   a) The aftereffects of my cancer diagnosis substantially limited major life activities, including chronic fatigue and cognitive function, requiring intermittent leave as an accommodation under 42 U.S.C. § 12102(2)(A).

b) These accommodations were consistently honored until I engaged in protected activity by filing a charge with the EEOC. This abrupt and targeted reversal—immediately following my protected activity—demands Ryder admit whether this constitutes unlawful retaliation under the ADA's anti-retaliation provision, 42 U.S.C. § 12203(a).

136) Following the filing of my EEOC charge, Ryder reversed course: my previously granted accommodations were disrupted, I was subjected to unfounded discipline, and targeted scrutiny began, none of which occurred prior.

a) Ryder's interference violates its own ADA Policy (Exhibit P) and federal law. The burden is now on Ryder to admit or deny that its treatment changed only after protected activity commenced.

137) In or around November 2024, Stephen Toms ordered management to assign me mandatory overtime, targeting me specifically due to my protected activities. When Gonzalez raised concerns about my availability, Toms responded, "Then we'll write him up."

a) Allen Adams later confirmed this retaliatory intent through text messages, stating, "Jesse will just use FMLA," while directing Samuel Gonzalez to reassign the work to another employee, Angelo Riel.

i) That statement constitutes direct evidence of discriminatory motive and a de facto admission of interference with ADA-protected rights, as prohibited by 42 U.S.C. § 12203(a) (retaliation) and § 12203(b) (coercion).

ii) Adams' directive—'Jesse will just use FMLA'—constitutes overt interference with ADA rights under § 12203(b), proving retaliatory intent

ii) These communications are a de facto direct admission of ADA interference and prove retaliatory animus as defined under 42 U.S.C. § 12203(a) and (b).

138) Shortly after Allen Adams and Samuel Gonzalez exchanged communications revealing intent to disregard Toms, directive, I was issued a retaliatory corrective action falsely attributing delays in my ADA accommodation approval to my conduct, despite those delays being entirely due to "alleged "internal administrative failures at Ryder and no fault of my own.

139) As just mentioned, I was issued a retaliatory "coaching" corrective action, falsely accusing me of untimely call-ins and noncompliance—despite my repeated and documented adherence to Ryder's policy, including entering my leave into Workday and notifying my immediate manager, Samuel Gonzalez, each time I used a reasonable accommodation.

140) Stephen Toms never once verified this with Gonzalez, never reviewed the Workday logs, and instead falsely initiated a disciplinary action without conducting even the most basic fact-checking required by Ryder's own policy.

141) Under Ryder's disciplinary protocol, corrective actions require:

a) Verified documentation of misconduct,

b) Progressive discipline steps,

c) Approval and review from HR based on substantiated facts.

   i) Yet none of these standards were followed.

142) The coaching was approved by HR without a single piece of corroborating evidence, and HR parroted Toms' vague and unsupported claims without review. This was not a "coaching"—it was a targeted warning designed to retaliate against me for engaging in protected conduct.

143)  It was only after I escalated the matter to corporate compliance, Rockwell Automation, and federal agencies that Ryder initiated its internal Risk Questionnaire (Exhibits 49–50) an audit designed to assess legal exposure. The results were proved the following:

a)  I had fully complied with all ADA and FMLA procedures,

b)  The coaching had no basis in fact,

c)  The discipline posed a legal risk to Ryder and should never have been issued.

144)  In response, Maria Ruiz, Vice President of Employee Relations and the very compliance officer listed in Ryder's 2021 EEOC Consent Decree, rescinded the write-up and called it a "clerical error." This excuse had never been used before and only surfaced after exposure to outside scrutiny. But if it were truly clerical:

a)  Why was it approved through multiple HR channels?

b)  Why was it entered into my employee record without validation?

c)  Why did no one contact my direct manager, Samuel Gonzalez, who could have immediately confirmed my compliance?

145)  Stephen Toms manipulated the system to punish me, and Maria Ruiz helped bury it. Instead of investigating Toms' misconduct or holding him accountable for retaliation and policy violations, Ruiz invoked a retroactive, baseless excuse to save face and shield Ryder from liability. As a compliance officer, and VP of ER, Ruiz was duty-bound to act independently, but instead chose to facilitate retaliation by masking discrimination as administrative oversight.

146)  Ryder's Anti-Retaliation Policy (Exhibit G) specifically prohibits any adverse action against employees using protected accommodations. Yet I was:

a)  Disciplined for following policy,

b) Publicly discredited without evidence,

c) And forced to fight internally and externally just to clear my name.

147) *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), defines a material adverse action as anything that would dissuade a reasonable worker from engaging in protected activity. This write-up and the campaign to justify it—meets that standard without question. *Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000), holds that shifting, contradictory justifications are prima facie evidence of pretext.

Here, Ryder first defended the coaching, then reversed it without explanation—proving it was retaliatory all along.

148) This wasn't a clerical oversight. It was a calculated act of retaliation, approved without evidence, and later concealed by HR leadership once legal exposure became unavoidable. Maria Ruiz didn't correct the mistake; she covered it up.

149) Ryder's internal safeguards failed because they weren't followed. They were weaponized to protect discriminatory management, not the employees those policies are meant to defend.

150) I further state, Ryder's blind deference to Stephen Toms, despite repeated contradictions, false statements, and confirmed retaliation—mirrors the same discriminatory conduct described in Counts I-III, where the defendants;

a) Chose to validate Toms' narrative over objective facts, even after its own internal processes disproved his claims, triggering the "Risk Questionnaire";

b) Whether in denying my promotion based on vague, post-hoc criticisms ("arrogant," "unprepared"), or suppressing my pay while approving overtime for others, or falsely disciplining me for ADA-protected absences;

c) Consistently acted upon Toms' word without any verifiable evidence, while ignoring their own written policies, Workday records, and the victim's input.

d) As this isn't coincidence, it's a well calculated corroboration, that the same retaliatory and discriminatory animus driving Counts I–III is present and undeniable in Count IV.

e) Ryder's choice to elevate a provably dishonest manager's word over hard documentation is a conscious act of corporate ratification, and it solidifies retaliation under the ADA, just as it does under Title VII.

f) As the reversal of the write-up, issued without condition or dispute, functions as a de facto judicial admission of wrongdoing. While not a formal admission under Rule 36(b), the unqualified rescission confirms that Ryder acknowledged the write-up lacked merit. Such internal reversal, following external escalation, constitutes compelling evidence of retaliatory motive and absence of legitimate cause

g) I further state Human Resources officials—including Maria Ruiz—were aware that the corrective action was retaliatory and based on false information yet took no proactive steps to address the malice intent for its issuance.

i) Their inaction constitutes deliberate indifference, and constructive ratification of retaliation, in violation of both ADA compliance standards and Ryder's own Principles of Business Conduct.

151) I also allege after requesting and using accommodations, I was the only CLM denied overtime payments that were automatically given to similarly situated non-accommodated employees—whereas:

a) The defendant's refusal to compensate me, forcing repeated escalations while they violated multiple internal policies (Exhibits T, E, G, and P), constitutes ADA-based wage retaliation through selective enforcement and coercion.

152) As evidenced in the "good faith" payments to me, totaling approximately $540, for overtime hours I could recall, that were previously denied, despite having simultaneously maintained that I was not entitled to that pay. This contradiction exposes a coordinated pattern of ADA retaliation, wage theft, and constructive admissions of liability.

a) The payments were issued only after continuedly I escalated complaints regarding overtime to discrimination and pay suppression. Ryder did not proactively acknowledge error or offer remedy until they knew they were going to terminate me.

b) Under the FLSA, "good faith" payments (29 U.S.C. § 260) are only made when the employer acknowledges that wages were owed. Ryder's issuance of these payments, combined with continued denial of entitlement, proves intentional misconduct, not clerical error.

c) Ryder's continued denial of my overtime eligibility, despite issuing "good faith" payments for those hours—constitutes a direct contradiction that is judicially cognizable. This inconsistency fatally undermines any affirmative defense of clerical error, mistake, or misclassification.

d) Considering the Fair Labor Standards Act and Ryder's internal policies, their actions constitute compelling evidence of willful misconduct and a retaliatory intent to suppress protected activity. Especially considering, I was the only CLM required to provide proof of overtime already worked, in violation of:

i) Exhibit T (Working Hours & Pay – HR 02.02 POL), which states salaried

employees must receive full pay for any week worked;

ii) Exhibit P (ADA – HR 05.04 POL), which prohibits adverse action against employees using or requesting accommodations;

iii) Exhibit G (Anti-Retaliation – C&E 15.01 POL), which bars retaliation for engaging in protected activity or using FMLA/ADA accommodations.

e) After confirming that other similarly situated employees were, in fact, receiving overtime, Maria Ruiz invoked a non-existent "spoken word" policy to conceal the intent in denying me equal pay. Rather than correcting the discrepancy, she demanded that I reconstruct my own work hours, a burden that was not imposed on any non-accommodated employee. This selective enforcement, following confirmation of the truth, constitutes a retaliatory and coercive act in violation of Anderson v. Mt. Clemens Pottery Co., 328

U.S. 680 (1946), which places the burden of accurate timekeeping on the employer and violates the ADA's anti-coercion provision under 42 U.S.C. § 12203(b).

f) Rockwell's Supplier Code (Exhibit W, Page 5) mandates investigation of ethics complaints, yet it ignored my reports of retaliation—a contractual breach establishing control under Browning-Ferris.

153) By issuing "good faith" payments only after I identified two specific dates I could recall—supported by email documentation—and while simultaneously preparing my termination, Ryder did not act in good faith. It acted in calculated legal self-preservation.

154) Despite verifying my presence and issuing those payments, Ryder continued to deny my overall eligibility, refused to audit its own timekeeping records, and instead demanded that I

reconstruct an entire year of overtime—a coercive and retaliatory burden never imposed on non-disabled or non-complaining employees.

a) Rockwell's contractual power to audit Ryder's labor practices satisfies the NLRB's 2023 joint employer test, which recognizes indirect control as dispositive

155) These payments were not discretionary acts of compliance; they were strategic attempts to:

a) Mask legal exposure associated with my imminent termination;

b) Suppress ADA-protected conduct through financial coercion;

c) Create the false appearance of compliance while actively retaliating.

d) This conduct qualifies as: d) A violation of 29 C.F.R. § 516.2 (recordkeeping fraud);

e) A predicate act under 18 U.S.C. § 1341 (mail/wire fraud and misrepresentation);

f) A violation of 42 U.S.C. § 12203(a) (ADA anti-retaliation); and

g) A material adverse action under Burlington Northern, 548 U.S. 53 (2006), given that the denial and coercion directly followed my use of intermittent FMLA and ADA-protected accommodations.

156) Ryder's own position statements and internal actions establish an irreconcilable contradiction concerning my eligibility for overtime pay, proving that the company knowingly retaliated against me for engaging in ADA-protected conduct.

a) In both their first (Nov 15, 2024) and second (Feb 3, 2025) position statements, Ryder unequivocally asserts that I was a salaried exempt employee and therefore "not entitled to overtime compensation." They further allege that I "provided no evidence" of overtime worked.

b) Despite Ryder's position that I was ineligible for overtime compensation, the company issued two "good faith" payments totaling approximately $540, specifically for the dates and I could recall at the time. These payments were not discretionary acts of courtesy. Under 29 U.S.C. § 260, a "good faith" payment is legally recognized as an acknowledgment that wages were owed.

c) The selective reimbursement, made only after external escalation and my pending unlawful termination, —confirms that I had, in fact, earned the compensation they initially denied.

d) Yet instead of auditing their own records, Ryder demanded that I reconstruct an entire year's worth of overtime hours, a coercive burden not imposed on any other non-disabled CLM or similarly situated employee.

e) This demand, placed exclusively on a disabled employee following use of ADA-protected accommodations, constitutes retaliatory coercion under 42 U.S.C. § 12203(b) and is further evidence of discriminatory treatment in violation of the ADA.

f) By first issuing compensation, then denying its legitimacy, and finally shifting the legal burden of recordkeeping onto me, Ryder engaged in deliberate, bad-faith conduct designed to suppress my rights under the ADA and punish me for asserting them.

157) If I was truly salaried exempt, why was overtime compensation selectively paid to me? —while it was automatically paid to others in identical roles who were non-disabled? This disparate enforcement of pay policy, based on who used ADA/FMLA accommodations or engaged in protected activity, constitutes retaliatory animus.

158) Moreover, Stephen Toms was allowed to determine, arbitrarily, who received overtime and who didn't, despite Ryder's own policies requiring uniform compensation practices for

similarly situated employees (see Exhibit T – Working Hours & Pay Policy (HR 02.02 POL) and Exhibit G – Anti-Retaliation Policy).

159)    Defendants' shifting justifications, misclassification defenses, and selective payroll practices constitute prima facie evidence of pretext under Reeves, and further establish that Ryder's "salaried exempt" claim is being used not as a classification, but as a weapon to suppress protected conduct in violation of 42 U.S.C. § 12203, the ADA's anti-retaliation provision.

**<u>Legal Conclusion for Count IV (Disability Discrimination Under the ADA)</u>**

160)    Based on the foregoing allegations and applicable legal precedents, the plaintiff respectfully requests that this Court find the following for Count IV in the proceeding paragraphs.

161)    I am a qualified individual with a disability under the Americans with Disabilities Act (ADA), as amended, 42 U.S.C. § 12102, and was granted reasonable accommodations, including modified work hours and intermittent FMLA, which Ryder initially honored without issue.

162)    That defendants reversed course and began interfering with these accommodations only after I engaged in protected activity, namely filing an EEOC charge, thereby triggering the ADA's retaliation provisions under 42 U.S.C. § 12203(a) and (b).

163)    That communications between management (including statements from Stephen Toms and Allen Adams) confirm a retaliatory motive by referencing my protected FMLA usage approved as an accommodation as a justification for targeted discipline, satisfying the element of retaliatory animus and rendering the adverse actions unlawful.

164) That the retaliatory corrective action issued in connection with my ADA accommodation delay, later rescinded after external escalation, was both a materially adverse employment action under Burlington Northern and a de-facto judicial admission under FRCP 36(b), as no legitimate basis was ever presented for its issuance.

165) That Ryder selectively withheld overtime compensation from me, while comparators, specifically non-disabled CLMs—received it automatically and without escalation, thereby subjecting me to disparate treatment in direct violation of ADA anti-retaliation provisions (42 U.S.C. § 12203(a)) and Ryder's internal policies (Exhibits T, G, and P).

166) That Ryder issued two "good faith" payments totaling $540, corresponding to the dates I could remember for overtime selectively enforced, and made such payments only after deciding to terminate my employment; establishing that Ryder

a) (1) Knew the wages were owed,

b) (2) Admitted liability through payment, and

c) (3) Cannot now claim mistake or exemption without violating 29 U.S.C. § 260 and 29 U.S.C. § 216(b).

167) That Ryder's continued denial of my eligibility of those wages after issuing those payments, coupled with its demand for pre-payment "proof" and simultaneous position statements that both deny and confirm the pay—constitutes:

a) A judicially cognizable admission of retaliation,

b) A violation of Anderson v. Mt. Clemens, 328 U.S. 680 (1946), and

c) A direct breach of 42 U.S.C. § 12203(b)'s prohibition on coercion for engaging in protected ADA activity.

168)    That Ryder's dual position statements (Nov 15, 2024, and Feb 3, 2025) contain material contradictions, namely asserting that I was never denied pay and simultaneously admitting Maria Ruiz approved such pay without requiring proof, while still asserting I was not entitled. These internal inconsistencies create a triable issue of fact and constitute prima facie evidence of pretext under *Reeves v. Sanderson Plumbing*.

169)    That no similarly situated employee outside of my protected class—either by race, disability status, or use of FMLA status—was subjected to the same adverse actions, burdens, or post-hoc justifications, thereby confirming disparate treatment under both the ADA and Title VII standards of analysis, mirroring the defendants conducted stated globally.

### COUNT V: JOINT EMPLOYER LIABILITY

151.    Rockwell Automation, under the authority of its Supplier Code of Conduct (Exhibit W), contractually obligated Ryder to uphold anti-discrimination, anti-retaliation, and fair labor practices. Yet, despite receiving multiple formal complaints from me, Rockwell deliberately failed to intervene, effectively endorsing Ryder's unlawful conduct.

152.    In September 2024, I filed an ethics complaint with Rockwell outlining racial discrimination, FMLA interference, and retaliation. I followed up with multiple emails exposing policy violations and retaliation by Ryder management, including Stephen Toms and Allen Adams.

153.    Rockwell ignored these complaints. There was no investigation, no response, and no corrective action. By remaining silent while maintaining oversight of Ryder's operations, Rockwell became complicit in a pattern of discriminatory and retaliatory abuse.

154. Rockwell exercised direct and indirect control over Ryder's employment decisions, including hiring, firing, and disciplinary actions, meeting the joint employer standard under *NLRB v. Browning-Ferris Indus.*, 691 F. App'x 461 (9th Cir. 2017). Rockwell knew about the illegal conduct and chose profit over compliance.

155. My Final Written Warning, issued on November 8, 2024, was not merely a Ryder act—it was directed by Rockwell executives, in consultation with Ryders leadership. When I contacted Rockwell about it, they lied, claiming they had no control over Ryder's decisions—in direct contradiction to their contractual authority and repeated involvement.

156. These facts satisfy the joint employer test under *EEOC v. Skanska USA Building, Inc.*, 524 F. App'x 315 (6th Cir. 2013), where liability was imposed on a company that exerted functional control over another's employment policies while attempting to dodge accountability.

157. In November 2024, when I contacted Rockwell about my Final Warning, I was told "Rockwell has no control over Ryder." Their own Supplier Code of Conduct (which demands suppliers enforce anti-retaliation, safety, and fair labor standards) mandates oversight—yet they opted for strategic inaction, allowing Ryder to destroy careers unchecked.

158. Rockwell's de facto control, paired with its refusal to enforce its own standards, solidifies joint employer liability under Browning-Ferris. Their silence was complicity. Their inaction was consent. They can't hide behind Ryder while pulling the strings from above.

**Legal Conclusion for Count V (Joint Employer Liability)**

170)    Based on the foregoing allegations and applicable legal precedents, I respectfully request that this Court find the following for Count V in the proceeding paragraphs.

171)    Rockwell Automation, as a joint employer, is liable for the discriminatory and retaliatory actions taken against me by Ryder.

172)    Despite contractually binding Ryder to its Supplier Code of Conduct, Rockwell failed to enforce its own Anti-Discrimination policies, ignored my ethics complaint, and actively participated in my discipline which led to my wrongful termination.

173)    Rockwell's inaction and direct participation in my discipline violate Title VII and the ADA, which hold joint employers accountable for unlawful employment practices.

174)    Rockwell exercised joint control over hiring, discipline, and employment policies, satisfying the standard for joint employer liability under *NLRB v. Browning-Ferris Indus*.

175)    Rockwell's Supplier Code of Conduct obligated them to enforce anti-discrimination policies, yet instead directed my discipline, while denying control. This Skanska standard of joint liability is compounded by their refusal to investigate my lawful complaints.

176)    Despite having contractual obligations to prevent discrimination, Rockwell ignore multiple reports of violations of Federal law.

177)    By failing to act, Rockwell knowingly ratified Ryder's discriminatory and retaliatory practices, further solidifying its liability.

178)    Rockwell's claim that it "had no control over Ryder" directly contradicts its contractual obligations under the Supplier Code of Conduct and its active participation in my discipline.

### Jury Demand

179)    Plaintiff demands a jury trial on all triable issues, including liability, compensatory damages, and punitive damages under 42 U.S.C. § 1981a(c)

**PRAYER FOR RELIEF**

180)   Pursuant to Title VII of the Civil Rights Act and the Americans with Disabilities Act

WHEREFORE, Plaintiff Jesse Holloway respectfully requests that this Honorable Court

enter judgment in his favor and against Defendants Ryder System, Inc. and Rockwell

Automation, jointly and severally, and award the following relief:

a)  Compensatory Damages

i)   Award compensatory damages for emotional distress, reputational harm, and

psychological suffering resulting from the Defendants' willful violations of federal

civil rights laws.

b)  Back Pay and Front Pay

i)   Back pay for all lost wages, benefits, and overtime incentives unlawfully withheld

due to retaliatory denial of promotions and wrongful adverse actions;

ii)  Front pay to account for lost future earnings, career disruption, and removal from

leadership succession due to retaliation and discriminatory exclusion.

c)  Punitive Damages

i)   Punitive damages are warranted under *Kolstad v. ADA*, 527 U.S. 526 (1999), as

Defendants acted with reckless indifference to federally protected rights.

d)  Monetary Damages in Excess of $5,000,000

i)   Award total damages — including back pay, front pay, compensatory damages, and

punitive damages — in excess of Five Million Dollars ($5,000,000.00), subject to

determination by a jury and as allowed by law.

e)  Injunctive and Equitable Relief

    i)   Issue an order requiring Defendants to expunge all retaliatory disciplinary documents and false allegations from Plaintiff's personnel file;

    ii)  Mandating anti-retaliation and anti-discrimination training for Ryder and Rockwell personnel;

    iii) Enforcing a 5-year court-supervised corrective action plan at the Whitestown facility;

    iv) Prohibiting further acts of discrimination, harassment, or retaliation by Defendants against any employee engaged in protected activity.

f)   Reinstatement or Alternative Relief

    i)   Reinstate me to a comparable leadership role or alternatively award front pay and career restoration compensation in lieu of reinstatement if the work environment remains hostile.

g)   Attorneys' Fees and Costs

    i)   Award fees, court costs and all litigation-related expenses as provided under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 12205.

h)   Prejudgment and Post judgment Interest

    i)   Award both prejudgment and post judgment interest on all damages awarded, calculated at the maximum rate permitted by law.

i)   Further Relief

    i)   Grant such other and further relief as the Court deems just and proper, including referral to the DOJ Civil Rights Division, mandatory compliance auditing, and contract debarment review for Rockwell Automation for failure to enforce anti-discrimination standards on its contractors.

**Declaratory Relief**

181)    Plaintiff respectfully requests that this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that;

182)    Defendants' actions constituted unlawful racial discrimination, retaliation, and disability discrimination in violation of Title VII and the ADA.

183)    The disciplinary actions and termination imposed upon Plaintiff were retaliatory and unlawful;

184)    Rockwell Automation, Inc. is jointly liable as a joint employer based on its contractual oversight, operational control, and ratification of discriminatory conduct;

185)    Ryder's policies and practices, including retroactive job requirements and the weaponization of subjective criteria, constitute unlawful employment practices in violation of federal law.

186)    Such declaratory relief is necessary to prevent ongoing harm and clarify the rights of the Plaintiff under federal law

## REQUEST FOR SANCTIONS PURSUANT TO THE COURT'S INHERENT AUTHORITY AND RULE 11

187)    Plaintiff further reserves the right to seek sanctions against Defendants and their counsel for knowingly submitting false statements, engaging in bad faith litigation tactics, and misrepresenting material facts to the EEOC and this Court, in violation of Fed. R. Civ. P. 11, 28 U.S.C. § 1927, and the Court's inherent authority—but not limited to, post hoc justifications, contradictory representations, and the suppression of adverse documentation.

188)    Plaintiff will move for sanctions at the appropriate procedural stage should the Defendants' pattern of litigation misconduct persist.

Respectfully Submitted

/s/ Jesse Holloway

Jesse Holloway
11215 willowmette LN
Indianapolis, In 46235
765-240-3118
Plaintiff, Pro Se
April 07, 2025