UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
03/30/2026
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

**JESSE HOLLOWAY,** )
**Plaintiff,** )
)
**v.** )
) **Case No. 1:25-cv-00678-RLY-MG**
**RYDER INTEGRATED LOGISTICS, INC.,** )
**and ROCKWELL AUTOMATION, INC.,** )
**Defendants.** )

# PLAINTIFF'S COMBINED CROSS-MOTION FOR RELIEF UNDER RULE 56(d) AND MOTION TO STRIKE DECLARATIONS OF TIM O'BRIEN AND STEPHEN TOMS IN OPPOSITION TO DEFENDANT RYDER'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………...4

INTRODUCTION……………………………………………………………………...5

PLAINTIFF'S GOOD-FAITH EFFORTS TO OBTAIN DISCOVERY…………………………6

LEGAL STANDARD…………………………………………………………………..7

ARGUMENT…………………………………………………………………………...7

I. The Termination Script Is Direct Evidence of Consciousness of Guilt ..……………………7

II. Ryder's Own Admissions and Records Establish Decision-Maker Awareness …………8

A. Ryder's Sworn Discovery Responses Admit Awareness ……….……………………8

B. Internal Records Confirm Knowledge Through Legal Channels ..……………………9

C. Ryder Blocked Discovery to Prevent Proof ………………………………………10

D. The Investigation Closed Seven Days Before Termination …………………………10

E. The Termination Decision Preceded Its Cited Grounds...……………………………10

III. O'Brien Decl. ¶ 5: Adams Was Isbell's Proxy ………………………………………11

IV. O'Brien Decl. ¶¶ 7–8: Letter Was "Premature" ..…………………………….……12

V. O'Brien Decl. ¶ 9 / Toms Decl. ¶ 4: Health Condition Knowledge …..………………13

VI. Toms Decl. ¶¶ 6, 11, 12, 14: Promotions……………………………………………..14

A. Khan: Requisition, Not "Job Progression" ……..……………………………………14

B. The Five-Stage Escalation……………………………………………………………14

C. Delashmit: "Well" Not "Excellent" …………………………………………………16

D. Toms Decl. ¶ 14: Both Supported LM Shifts………………………………………...17

VII. Comparators: Blocked Discovery / Snyder Contradiction……………………………..18

A. Snyder: Denied Under Oath, Admitted to EEOC……………………………………18

B. Progressive Discipline Double Standard……………………………….………18

C. All Named Comparator Discovery Refused……………………………………….19

VIII. FWW Based on Hearsay Without Investigation…………………………………….20

IX. Spot Bonus: Four-Way Contradiction…………………………………………………...20

X. O'Brien Decl. ¶ 17: "Pass-Eligible" Background Check………………………………22

XI. Rockwell's Role: FMLA Monitoring / FWW Trigger…………………………………..23

XII. Privileged Communications: Volume and Timing……………………………………...23

XIII. Corporate Whitewash: "Unsubstantiated" Yet Corrective Action Taken……………...24

XIV. EEOC Position Statements Omitted FWW and FMLA Letter………………………...25

XV. KK Statement Suppression / Delashmit Timeline……………………………………...26

CONCLUSION………………………………………………………………………………29

# TABLE OF AUTHORITIES

## Cases

*Albiero v. City of Kankakee,* 246 F.3d 927 (7th Cir. 2001)……………………………………….7

*Bracey v. Herringa,* 466 F.2d 702 (7th Cir. 1972)…………………………………………………29

*Burnett v. LFW Inc.,* 472 F.3d 471 (7th Cir. 2006) ……………………………………………...13

*Deere & Co. v. Ohio Gear,* 462 F.3d 701 (7th Cir. 2006) ………………………………………..7

*Hitchcock v. Angel Corps, Inc.,* 718 F.3d 733 (7th Cir. 2013) …………………………………..16

*Kalis v. Colgate-Palmolive Co.,* 231 F.3d 1049 (7th Cir. 2000) ………………………………….7

*Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359 (7th Cir. 1988) ……………………………….7

*Rudin v. Lincoln Land Cmty. Coll.,* 420 F.3d 712 (7th Cir. 2005) ……………………………...19

*Woods v. City of Chicago,* 234 F.3d 979 (7th Cir. 2000) ………………………………………...7

## Statutes and Rules

29 U.S.C. § 2612(a)(1)(D) ……………………………………..........................................13

Fed. R. Civ. P. 37(c)(2) ………………………………………..........................................18, 30

Fed. R. Civ. P. 56(c)(2) ……………………………………….................................................7

Fed. R. Civ. P. 56(c)(4) ……………………………………….................................................7

Fed. R. Civ. P. 56(d) ………………………………………..............................................7, 29

**INTRODUCTION**

Ryder's Motion for Summary Judgment is built on a three-step strategy: block discovery, declare the facts "undisputed," and argue Plaintiff "does not and cannot offer any evidence." Brief at 2. But this strategy collapses under the weight of Ryder's own records. Ryder's internal investigation substantiated Plaintiff's FMLA allegation and confirmed the proxy designation that O'Brien's declaration denies. Ex. P at 105. Ryder's termination script pre-scripted the denial of any connection to Plaintiff's complaints. Ex. II at 321. Ryder's background check cleared Plaintiff as "Pass-Eligible." Ex. HH at 316. Ryder's EEOC Position Statement in a separate case admits disciplining the very comparator it denied disciplining under oath in this case. Ex. O at 100. Toms's own statements to Ryder's investigators characterize Plaintiff's interview as "OK"—not the "unprepared" characterization that appears for the first time in his litigation declaration twenty months later. Ex. W at 149. And Ryder's own Employee Relations investigation found Adams's misconduct in the FMLA matter "Substantiated." Ex. AA at 186.

Ryder's own First EEOC Position Statement told the EEOC that spot bonuses are paid "automatically" and that Toms "approved all requests"—then Toms declared in this litigation that he "had misses" paying white CLMs. Ex. LL at 335–336; Toms Decl. ¶ 17. The same Position Statement conceded that Plaintiff "was stronger in his interview"—a characterization that counsel deliberately deleted from the Second Position Statement three months later, as the litigation narrative was being constructed. Ex. LL at 337; Ex. MM at 343. And both Position Statements told the EEOC that Plaintiff "had not submitted any information" about unpaid bonuses—a claim that was demonstrably false when made, because Ryder's own ER records document that Plaintiff had provided specific dates four weeks earlier. Ex. Z at 175.

Every grain of sand in this record points in the same direction: Ryder's "undisputed" narrative is disputed by Ryder's own documents.

## PLAINTIFF'S GOOD-FAITH EFFORTS TO OBTAIN DISCOVERY

Plaintiff made extensive, documented efforts to cure Ryder's discovery deficiencies without court intervention. On October 13, 2025, following a meet-and-confer conference, Plaintiff served a comprehensive Discovery Deficiency Notice identifying specific Federal Rule violations and proposed cures. Ex. A at 2–12. Defense counsel responded that they would provide privilege logs but were "not in a position to review" the deficiency notice. Ex. A at 13–15. On December 9 and 12, 2025, Plaintiff sent written follow-ups confirming deficiencies remained uncured. Ex. A at 20–21. On January 19, 2026, Plaintiff served a detailed Rule 37 notice. Ex. A at 24–25. On January 26, 2026, the parties held a second discovery conference. On January 27, 2026, Plaintiff served a final notice with annotated exhibits. Ex. A at 29–30. On January 30, 2026, defense counsel maintained their responses were sufficient. Ex. B at 26. On February 3, 2026, counsel confirmed: "We maintain the positions detailed in that response." Ex. B at 26. Fact discovery closed January 14, 2026. Plaintiff's Motions to Compel (ECF Nos. 157, 158) were denied without prejudice. The conferral record satisfies *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000).

## LEGAL STANDARD

Rule 56(d) provides that if a nonmovant shows by declaration that it cannot present facts essential to justify its opposition, the court may defer or deny the motion or allow time for discovery. Fed. R. Civ. P. 56(d). The Seventh Circuit grants such requests "as a matter of course when the party opposing summary judgment makes a good faith showing that it cannot yet effectively respond." *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 706 (7th Cir. 2006). Where a party's own discovery conduct creates the evidentiary vacuum it seeks to exploit, summary judgment should not be granted. See *Kalis v. Colgate-Palmolive Co.,* 231 F.3d 1049, 1058 n.5 (7th Cir. 2000).

Under Rule 56(c)(2) and (c)(4), declarations must be based on personal knowledge and set out admissible facts. Declarations "so contradicted by other evidence that no jury could reasonably believe" them should be disregarded. *Mechnig v. Sears, Roebuck & Co*., 864 F.2d 1359, 1363 (7th Cir. 1988). Conclusory, self-serving declarations without factual support are insufficient. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001).

## ARGUMENT

### I. The Termination Script Is Direct Evidence of Consciousness of Guilt.

Ryder's Bates-stamped production reveals a termination script prepared for the December 18, 2024 meeting instructing: "During the termination conversation*, make no reference to the complaints he's made internally or to the customer*. His complaints are NOT relevant to and did NOT factor into this decision." Ex. II at 321. The script further directs: "LESS IS BEST," instructs that "[w]e should be very careful about what we say about him or his termination internally and to the

customer," and orders immediate notification to O'Brien "who will handle communication to the customer immediately upon the end of the meeting." Ex. II at 322.

Employers do not pre-script the denial of any connection to employee complaints unless they are aware those complaints exist and are concerned about the legal inference. The script is consciousness-of-guilt evidence. It directly contradicts Ryder's central retaliation argument—that Plaintiff "does not and cannot offer evidence" connecting adverse actions to his EEOC charge. Brief at 23. The script is that evidence.

## II. Ryder's Own Admissions and Records Establish Decision-Maker Awareness of Protected Activity.

### *A. Ryder's Sworn Discovery Responses Admit Awareness.*

First RFA No. 7: Ryder admitted "as of November 8, Plaintiff had submitted complaints referencing Toms and filed a charge." Ex. EE at 236. Third RFA No. 1: Ryder admitted "Amy Mesaros, Allen Adams, and Tim O'Brien were aware that Plaintiff had submitted internal complaints to Ryder prior to the Final Written Warning." Ex. FF at 239. First Interrogatory No. 5: Ryder identified these individuals as involved in the FWW and stated "some of these individuals were aware that Plaintiff had previously submitted internal complaints." Ex. FF at 250–51.

These admissions directly contradict Ryder's Brief at 23: "Plaintiff offers no evidence related to if or when O'Brien became aware of Plaintiff's Charge." Ryder's own discovery responses are that evidence.

***B. Internal Records Confirm Knowledge Through Legal Channels.***

HRC1628501 work notes (October 16, 2024): "Amy Mesaros (Work notes) Uploaded into evidence email sent by Jesse Holloway to Stephen Toms on 10/15/24. Also forwarded copy of email to Susan Bassford-Wilson." Ex. Y at 169. Mesaros—one of the three FWW decision-makers—forwarded Plaintiff's complaint directly to Ryder's Assistant General Counsel three weeks before the FWW was issued.

HRC1669157 work notes (November 12, 2024): "Amy Mesaros, Jennifer Birriel, and Maria Ruiz met on Monday, 11/11/24" and directed: "Inform Abby Follis to stop communication with Mr. Holloway." Ex. AA at 183. The ER team cut off the assigned investigator's contact with Plaintiff while routing his complaints through legal—consistent with coordinating adverse action, not good-faith investigation. On the same date, a follow-up meeting with AGC Wilson was scheduled for November 15—the same day as the first EEOC Position Statement.

***C. Ryder Blocked Discovery to Prevent Plaintiff from Proving What Its Own Records Confirm.***

First Interrogatory No. 1 asked for the earliest awareness date and each person with knowledge. Ryder disclosed only one date: "on or about October 8, 2024." Ex. FF at 247. First Interrogatory No. 3 narrowed to Whitestown employees. Ryder disclosed only "on or around October 18, 2024." Ex. FF at 249. The Privilege Log shows communications began October 10—two days after legal received the charge—involving Wilson (AGC), outside counsel Ligarde, and at least eight others. The Privilege Log also references "post-October 2024 Charge communications" as a withheld category. Ryder disseminated charge knowledge through legal channels, claimed privilege, and now argues Plaintiff cannot prove awareness.

***D. The Investigation Closed Seven Days Before Termination.***

CE-34084—the comprehensive investigation into Plaintiff's discrimination, retaliation, and poor management allegations—closed December 11, 2024. Ex. R at 115–16. Plaintiff was terminated seven days later. The investigation listed "Retaliation" as an alleged category and identified "Requested or took time off pursuant to FMLA" as the covered activity. Ex. R at 115. The proximity between the retaliation investigation's closure and termination—combined with the termination script's instruction to deny any connection to complaints—creates a powerful inference of retaliatory motive.

***E. The Termination Decision Preceded Its Cited Grounds.***

The Privilege Log reveals at least fourteen privileged email series spanning December 3–18, with five separate threads on December 5 alone involving every decision-maker named in the MSJ.

December 5 was the day after Plaintiff's email to Adams (SOF ¶ 42). Yet Brown's conversation (SOF ¶ 33) allegedly occurred December 10 and was reported December 16. The Powerfleet issue (SOF ¶¶ 39–41) was reported sometime in December. Counsel was mobilized before several termination grounds existed.

Regarding the Carter hiring (SOF ¶¶ 44–48), Ryder's own case notes state: "Based on information provided by Ops leadership (Allen Adams raised these concerns to his leadership team on 12/5/24), Mr. Holloway hired Carter for a new position/title without prior approval. This was addressed by ops leadership." Ex. AA at 186. If "addressed" on December 5, it should not be a termination ground thirteen days later—unless the termination was pretextual and grounds were accumulated after the decision was made.

**III. O'Brien Declaration ¶ 5 Is Directly Contradicted: Adams Was Isbell's Proxy.**

O'Brien declares: "When Isbell went on leave, no proxy was designated." O'Brien Decl. ¶ 5; SOF ¶ 17. Ryder's own investigation found: *"In this case, Allen Adams was assigned as Melissa Isbell's proxy."* Ex. P at 105. The investigation confirmed that "[t]he 11/5 FMLA Intermittent Leave entry was submitted on 11/4 and it was subsequently approved by Allen Adams on behalf of Melissa Isbell on 11/12." Id. O'Brien swore under penalty of perjury to a fact his own employer's investigation disproved.

The investigation further found that O'Brien allegedly checked Workday: "Mr. Obrien stated the only date he saw was for 10/22/24, which was not one of the two days in question (10/29/24 and

11/05/24)." Ex. P at 104. O'Brien issued the FMLA letter based on his own error—then declared to this Court that no proxy existed, when one did. Paragraph 5 should be stricken.

**IV. O'Brien Declaration ¶¶ 7–8 Are Contradicted: The Letter Was "Premature" and Issued "In Error."**

O'Brien declares the letter was a justified "reminder of processes" and "in no way disciplinary." O'Brien Decl. ¶¶ 7–8. Ryder's investigation concluded: "Based on these findings the FMLA related letter (dated 11/7) that he received from Allen Adams on 11/8 was premature. The Manager and the HRBP that drafted the letter did not realize that the entries had been submitted and pending for approval." Ex. P at 105. The FMLA allegation was found "Substantiated." Id. The investigation recommended: "*Remove 11/07/24 FMLA notice from Mr. Holloway's Personnel File (Docufree)" and "[i]f an employee is a part of a litigation hold, Operations must vet any disciplinary actions with Employee Relations and legal*." Ex. P at 105.

This recommendation acknowledges that (a) the letter was in the personnel file system (belying the "non-disciplinary" characterization), (b) Plaintiff was on a litigation hold, and (c) future disciplinary actions should be vetted through legal. Additionally, the investigation found: "Other Misconduct — Allen Adams — Substantiated." Ex. AA at 186. Adams's own misconduct in the FMLA matter was substantiated by Ryder's ER department—yet the MSJ relies on Adams as a credible actor. Paragraphs 7–8 should be stricken.

The letter itself states: "Violations of the requirements described above are subject to disciplinary action." Ex. 2 (MSJ Brief at 4). A letter threatening disciplinary action for non-compliance is, by its nature, disciplinary—regardless of whether it was "logged" as such.

**V. O'Brien Declaration ¶ 9 and Toms Declaration ¶ 4 Are Contradicted: Both Had Knowledge of Plaintiff's Health Conditions.**

Both declarants deny knowledge of Plaintiff's health conditions. O'Brien Decl. ¶ 9; Toms Decl. ¶ 4. Yet Ryder admitted in Third RFA No. 2 that O'Brien "reviewed information and data in Workday related to Plaintiff's attendance." Ex. FF at 240. O'Brien himself admits knowing about Plaintiff's FMLA usage. FMLA leave is, by definition, leave for a "serious health condition." 29 U.S.C. § 2612(a)(1)(D). See Burnett v. LFW Inc., 472 F.3d 471, 478 (7th Cir. 2006), inferring tht knowledge of a disability can be inferred where an employer knows of facts from which a disability could reasonably be concluded.

As for Toms, Ryder's own investigation confirms that "Rockwell Operations reported Mr. Holloway was out two days Intermittent FMLA." Ex. P at 104. Toms was the Group Logistics Manager and Rockwell's primary contact. Plaintiff's First Interrogatory No. 9 sought communications between Toms and others about Plaintiff during the FMLA period. Ryder objected as "overbroad." Ex. FF at 253–54. Whether Rockwell's FMLA monitoring was communicated to Toms is a factual question Ryder blocked discovery to prevent Plaintiff from answering. Paragraphs 9 and 4 should be stricken.

## VI. Toms Declaration ¶¶ 6, 11, 12, and 14 Are Contradicted by Toms's Own Prior Statements, Adams's Contemporaneous Assessments, and Ryder's EEOC Position Statements.

### *A. Khan's Promotion Was a Requisition, Not a "Job Progression."*

Toms declares Khan's title change "was not part of any requisition or posting." Toms Decl. ¶ 6. In his June 7, 2024 interview with ER investigator Abby Follis, Toms stated: "It was, I was looking for external. I gave the recruiter stipulations. He only shared the ones who met. I had to ask him for the names so I can follow up." Ex. V at 146. Toms also stated: "*I opened a manager and opened a position bc of known risk of losing people*." Id. He identified the recruiter by name: "Faizal Khan." Id. And confirmed that "6 people applied internally." Id.

Director Calvin confirmed Toms "*should have interviewed the internal applicants*." Ex. CC at 211. Calvin's assessment that Toms "should have interviewed" applicants presupposes a position existed to interview for—contradicting the "job progression" narrative. One cannot give recruiter stipulations, have six people apply, and then declare under penalty of perjury it was "not part of any requisition." Paragraph 6 should be stricken.

### *B. The Five-Stage Escalation of Plaintiff's Interview Characterization.*

Toms declares Plaintiff "*came off as arrogant and unprepared*" and "*failed to give specific examples.*" Toms Decl. ¶ 11. The contemporaneous record tells a different story—one that reveals a characterization progressively degraded across five documented stages:

Stage 1 (September 10, 2024, HRC1542577 / HRC1554960): Toms told ER investigator Follis: "Jesse is opening another case……..came into the interview very arrogant, he stated he was the best CLM at the site and stronger than all the LM's at the site." Ex. V at 133. No mention of "unprepared." No mention of "failed to give specific examples."

Stage 2 (September 10, 2024, HRC1596991): Toms told Follis: "Interviewed OK, was not humble from the perspective of a servant leader, was arrogant." Ex. W at 149. The assessment *moderated* to "OK." Still no "unprepared." Still no "failed to give specific examples."

Stage 3 (November 15, 2024, First EEOC Position Statement): Ryder's own counsel, Constangy, Brooks, Smith & Prophete, LLP, stated to the EEOC: "Mr. Holloway was stronger in his interview and was meeting expectations in his current job." Ex. LL at 337. Ryder's counsel—operating on information provided by these same declarants—conceded that Plaintiff was the stronger candidate. This is the only characterization prepared with legal review before the litigation narrative was constructed, and it directly contradicts the declaration's "unprepared" characterization.

Stage 4 (February 3, 2025, Second EEOC Position Statement): The same counsel filed an amended statement in which the word "stronger" was deleted. The Second Position Statement states only

that "Mr. Holloway was meeting expectations in his CLM job at that time." Ex. MM at 343. The deliberate removal of the favorable characterization between two statements—filed by the same attorney at the same law firm—is evidence of narrative construction in anticipation of litigation.

Stage 5 (February 27, 2026, Litigation Declaration): Toms declares Plaintiff was "arrogant and unprepared" and "failed to give specific examples." Toms Decl. ¶ 11. The word "unprepared" and the phrase "failed to give specific examples" appear for the first time—twenty months after the interview and fourteen months after the Position Statement that called Plaintiff "stronger."

This five-stage degradation—from "very arrogant" to "Interviewed OK" to "stronger" to [deleted] to "unprepared"—is not the hallmark of honest recollection. It is the hallmark of a narrative being systematically constructed for litigation. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013). Meanwhile, Adams told ER that "both Mr. Delashmit and Mr. Holloway had a background in leadership" and that he "was able to rely on both of them to get the job done when I'm not around." Ex. JJ at 325. Plaintiff's 2023 annual review shows "Exceeds Expectations" in seven of twelve competencies, including Coaching, Courage, Customer Focus, Driving Results, Leading Teams, and Trust & Integrity. Ex. C at 40–47. Isbell wrote: "Jesse does a great job of working with his teams to make sure they are set up for success." Ex. C at 47. Paragraph 11 should be stricken.

***C. Delashmit's Interview Was "Well," Not "Excellent."***

Toms declares Delashmit had an "excellent interview." Toms Decl. ¶ 12. The contemporaneous assessment was "interviewed well." Ex. W at 149. The inflation from "well" to "excellent" mirrors the deflation of Plaintiff's assessment from "OK" to "unprepared." Both changes favor Ryder's litigation position. No interview notes, scoring rubrics, or evaluation records were produced. Plaintiff's Third Interrogatory No. 8 sought this documentation; Ryder refused. Ex. GG at 275. Delashmit was terminated three weeks after his promotion (SOF ¶ 82) and the position was never filled (SOF ¶ 83). Adams's own interview confirmed the parity: "They both have their strengths. However we need someone very team orientated who doesn't believe that they are above all of their peers. I was able to rely on both of them to get the job done when I'm not around." Ex. JJ at 325. The co-interviewer assessed the candidates as functionally comparable. Toms's declaration attempts to create a sharp distinction that Adams's own contemporaneous assessment does not support. Paragraph 12 should be stricken or disregarded.

***D. Toms Declaration ¶ 14 Is Contradicted: Plaintiff Also Supported LM Shifts.***

Toms declares that Delashmit "supported Logistics Manager shifts while Logistics Managers were out." Toms Decl. ¶ 14. This is presented as a distinguishing qualification unique to Delashmit. But Adams told the ER investigator: "I was able to rely on *both of them* to get the job done when I'm not around." Ex. JJ at 325. If Adams relied on "both" Holloway and Delashmit in the absence of senior leadership, then Plaintiff also supported operations when managers were out. Toms's declaration attributes this quality exclusively to Delashmit, which is directly contradicted by Adams's own statement. Paragraph 14 should be stricken or disregarded.

**VII. Ryder Argues Plaintiff Cannot Identify Comparators While Blocking All Comparator Discovery—and Its Own Records Reveal the Comparators It Denied.**

***A. The Snyder Contradiction: Denied Under Oath, Admitted to the EEOC.***

Third RFA No. 5 asked whether Snyder was disciplined due to employee complaints. Ryder denied, calling the request "irrelevant." Ex. FF at 241. But Ryder's own EEOC Position Statement in Nouvertne v. Ryder, EEOC No. 470-2025-01403, prepared by the same law firm, states: "Ultimately, other employees, both male and female, had issues with Mr. Snider's management style and he received a formal verbal counseling." Ex. O at 100. Ryder denied under oath that Snyder was disciplined. Ryder told the EEOC he was. Under Rule 37(c)(2), fees are mandatory for matters denied and later proven true.

***B. The Progressive Discipline Double Standard.***

Ryder enforced progressive discipline when Plaintiff issued discipline but abandoned it when disciplining Plaintiff. HR Business Partner Theresa Brummett instructed Plaintiff on April 4, 2024: "the discipline incident happened on 3/14/24 and should have been delivered within 7 days (New deadline), so now it is out of its timeframe and we will need to begin with a verbal warning again." Ex. Q at 107. ER Partner Bailey Snell rejected Plaintiff's attempt to skip a step for a safety violation: "*Even if this was not categorized as an at-risk behavior, we would follow progressive disciplinary action and we would not recommend a final written warning*." Ex. Q at 112. O'Brien

himself required "more detail of examples of non-performance in a final written warning" when Plaintiff sought to discipline subordinate Dian Hunter. Ex. Q at 109.

Yet Plaintiff's FWW was issued five weeks after the audit comments—well outside the 7-day window—and skipped directly to a Final Written Warning with zero prior discipline after the facility became aware of Plaintiff's EEOC charge. Ryder's Fourth RFP No. 2 response confirmed unlimited discretion: "At the Company's sole and absolute discretion, immediate dismissal without prior written or oral warning may be warranted for any offense." Ex. GG at 309. Unlimited discretion is precisely the environment where discriminatory application thrives. See *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 722 (7th Cir. 2005).

***C. Ryder Refused All Named Comparator Discovery.***

Plaintiff identified three comparators by name: Hycenth (forgery—Third Interrogatory No. 4, Third RFA No. 9); Akinade (locked employee in building—Third RFA No. 7)[1]; Snyder (supervisory complaints—Third RFA No. 5). Ryder objected to all as "irrelevant." Ex. FF at 241–43. Third RFP Nos. 9, 12, and 13 sought comparative discipline records. Ryder refused. Ex. GG at 299–303. Ryder now argues Plaintiff "cannot identify anyone treated more favorably." Brief at 19. A party cannot block comparator discovery and then exploit the resulting absence.

The Nouvertne case further reveals the pattern: Nouvertne (white, female) was terminated June 15, 2024 for "walking away from" Snyder three times—a decision made by Toms. Ex. O at 100.

[1] See Ex. I at 70 – 71 in which Ryder denied, See Ex. EE at 242

She had complained about Snyder's and Toms's management. Employees who complained about management at the Whitestown facility were terminated.

**VIII. The Final Written Warning Was Based Solely on Hearsay Without Independent Investigation.**

Third RFA No. 4: Ryder admitted it did not interview Plaintiff or auditors before the FWW. Ex. FF at 240–41. Ryder admitted Strayer's email was deemed "sufficient." Id. First RFA No. 6: Ryder conceded the FWW "referenced that Rockwell apprised Ryder of remarks." Ex. EE at 236. The five-week gap between the October comments and November 8 FWW is bracketed by EEOC charge receipt dates (October 8 legal, October 18 facility). Third RFA No. 8: Ryder evasively stated discipline was issued "shortly after detailed information" was provided "in November 2024"—not denying the five-week delay. Ex. FF at 242–43. Third RFP No. 5 sought Toms-Rockwell communications that would establish earlier knowledge. Ryder objected as "overbroad." Ex. GG at 297.

**IX. Toms Declaration ¶ 17 Is Conclusory, Self-Contradictory, and Contradicted by Ryder's Own EEOC Position Statements: The Spot Bonus Defense Fails.**

Toms declares he "had misses on paying spot bonuses to white and non-disabled Customer Logistics Managers." Toms Decl. ¶ 17. This self-serving assertion is contradicted by four independent sources—including two statements Ryder's own counsel made to the EEOC.

First, Ryder's First EEOC Position Statement, filed November 15, 2024 by Constangy, states: "*Ryder automatically pays* CLMs an on-call spot bonus of $270 per day for all pre-approved fifth and sixth days within a workweek." Ex. LL at 335 (emphasis added). A system that "automatically pays" bonuses does not produce "misses" requiring employee follow-up. Toms's declaration contradicts his own employer's sworn representation to a federal agency.

Second, the same Position Statement states: "Mr. Toms confirmed that he had *approved all requests* for spot bonuses received from all CLMs." Ex. LL at 336 (emphasis added). The Second Position Statement repeats: "Mr. Toms confirmed that he had approved all requests for spot bonuses submitted by CLMs." Ex. MM at 342. One cannot have "approved all requests" and simultaneously "had misses." These are irreconcilable positions taken by the same law firm in the same case.

Third, in Toms's own contemporaneous ER interview on September 10, 2024, Toms stated: "I don't recall anyone being denied in 7 months I've been here." Ex. X at 161. He cannot simultaneously recall no one being denied and declare—twenty months later—that white CLMs had "misses."

Fourth, SOF ¶ 89 claims Plaintiff "did not identify any specific dates or days to support his request." Both Position Statements repeat the claim that Plaintiff "had not submitted any information" about unpaid bonuses. Ex. LL at 336; Ex. MM at 342. But Ryder's own ER records at HRC1628501 document that Plaintiff identified specific dates to ER investigator Crystal Sulaka: July 18, July 25, October 2, and October 3, 2024. Ex. Z at 175. The First Position Statement was

filed on November 15, 2024—four weeks after Ryder's investigator had these dates in the file. This is a material misrepresentation to a federal agency.

Ryder admitted in Third RFA No. 11 that the incentive "was not embodied in a companywide 'written corporate policy.'" Ex. FF at 244. The investigation confirmed: "Operations does not have a written 'On Call Bonus program.'" Ex. P at 106. Plaintiff's Third Interrogatory No. 7 sought documentation of the program's administration. Ryder refused. Ex. GG at 274. Paragraph 17 should be stricken as conclusory, self-contradictory, and contradicted by Ryder's own Position Statements.

**X. O'Brien Declaration ¶ 17 Is Contradicted: The Background Check Returned "Pass-Eligible."**

O'Brien declares Plaintiff "would not have been employed." O'Brien Decl. ¶ 17. Plaintiff's pre-hire background check—including "US PKG 2 Crim and DT 4 panel Combined" (criminal screening and drug test) and "US PKG 3 Education and Employment" (employment verification)—returned "Pass — Eligible" and "BG:Pass_Eligible;DT:Negative." Ex. HH at 316. The screening was conducted by First Advantage. Moreover, Rockwell's Warehousing Agreement contractually mandated that Ryder conduct background checks on personnel assigned to the facility. Ryder's own contractually mandated, professionally conducted screening system cleared Plaintiff for employment after running the very checks designed to identify disqualifying information. O'Brien's conclusory post-hoc declaration is contradicted by the contemporaneous record. Paragraph 17 should be stricken.

**XI. Ryder Minimizes Rockwell's Role While Rockwell Monitored Plaintiff's FMLA and Triggered the FWW.**

Ryder asserts "Rockwell was not involved in the disciplinary decision." Brief at 20. But Rockwell monitored and reported Plaintiff's FMLA absences (Ex. P at 104), Rockwell's complaint triggered the FWW (SOF ¶ 24), and Ryder and Rockwell share the same law firm. Plaintiff's First Interrogatory No. 4 asked when Rockwell was informed of Plaintiff's complaints. Ryder objected. Ex. FF at 250. First RFP No. 7 sought MSA § 14.2 meeting minutes. Ryder claimed "not in possession." Ex. GG at 284. The claim that no meeting records exist from contractually required monthly governance meetings during a period when a customer complaint triggered discipline strains credulity.

**XII. The Volume and Timing of Privileged Communications Constitutes Independent Circumstantial Evidence.**

The Privilege Log's temporal alignment with adverse actions creates an irreconcilable dilemma. If the communications involved legal advice about Plaintiff's EEOC charge, decision-makers had knowledge of protected activity. If they were about routine HR decisions, there is no basis for privilege. The concentration is most acute on November 8 (FMLA letter and FWW both issued) and December 3–5 (five threads on December 5 alone, the day after Plaintiff's email to Adams). Director Calvin's email forwarding Plaintiff's wage request with the comment "I'm not shocked

with this generation" provides additional context for the facility leadership's attitude toward Plaintiff's advocacy. Ex. DD at 230.

**XIII. The Corporate Whitewash: Every Complaint "Unsubstantiated"—Yet Every Complaint Produced Corrective Action.**

Ryder's MSJ rests on a premise that Plaintiff was a serial complainer whose allegations were repeatedly investigated and found without merit. The record tells a different story. Every complaint Plaintiff filed was labeled "unsubstantiated." Yet Ryder's own records reveal that every complaint produced corrective action—a pattern so consistent that the label "unsubstantiated" appears to function not as a factual finding but as a corporate liability shield.

**The chairs complaint** (May 2024): "Unsubstantiated." Yet the chairs were returned "after only a few days." Ex. LL at 336.

**The Snyder complaint** (January 2024, via Nouvertne): "Unsubstantiated" in this litigation (Third RFA No. 5). Yet Snyder "received a formal verbal counseling." Ex. O at 100.

**The FMLA complaint** (November 2024): Found "Substantiated." Ex. P at 105. The letter was "premature," issued "in error," and ordered removed from the personnel file. Ex. P at 105. Adams's misconduct was "Substantiated." Ex. AA at 186.[2]

---

[2] Obrien and Toms both assert that the FMLA coaching/warning was just a letter nor affected Plaintiff…..Ironically, admissions provided to the EEOC by defendant's current counsel prior to this case filing, led the agency to conclude "*R (b) (5)rescinded CP's FMLA/ disability related attendance warning*". A letter does not have to be rescinded nor removed from an employee's personnel file. See Ex. MM at 347.

**The Delashmit/COI complaint** (July–October 2024): "Unsubstantiated." Yet "once the allegation was substantiated, action was taken towards Mr. Delashmit." Ex. KK at 328. He was terminated on or around September 19, 2024—while the case investigating Plaintiff's same complaint about Delashmit opened on 7/29/2024 remained open and was not closed until October 7, 2024, when it was retroactively declared "unsubstantiated." Ex. S at 118.

**The spot bonus complaint** (July 2024): "Unsubstantiated." Yet the investigation recommended: "Operations will create a written 'On Call Bonus program' which will be reviewed by HR and Legal prior to distribution." Ex. P at 106. Ryder does not create new written programs in response to unsubstantiated complaints.

**The investigation's own recommendations** belied the "unsubstantiated" label: "Pulse survey at the site to identify any concerns with the site's culture" and "Diversity and inclusion training for all management at site." Ex. KK at 328. Employers do not order diversity training and culture surveys at facilities where nothing is wrong.

The pattern is systematic: Plaintiff complained. Ryder investigated. The investigation found merit sufficient to justify corrective action. The label "unsubstantiated" was applied anyway. This is not investigation—it is corporate narrative management.

**XIV. Ryder's EEOC Position Statements Omitted the FWW and FMLA Letter—Then Both Were Used as Termination Grounds.**

Ryder's First EEOC Position Statement was filed November 15, 2024—one week after both the FMLA letter and the FWW were issued on November 8. Ex. LL. The Position Statement makes no mention of either. Third RFA No. 9 asked whether Ryder disclosed these actions to the EEOC. Ryder's response did not deny the omission. Ex. FF at 243. When Ryder filed its Second Position Statement on February 3, 2025, it disclosed the FWW and termination—but still omitted any mention of the FMLA letter. Ex. MM.

The sequence is telling: Ryder concealed both adverse actions from the EEOC when they were first filed, then used them as the basis for termination, and now relies on them as the evidentiary foundation for summary judgment. Ryder's willingness to omit material adverse actions from its EEOC submission is itself evidence that Ryder understood these actions were connected to Plaintiff's protected activity and would be difficult to defend.

**XV. The KK Statement Suppression and Delashmit Promotion Timeline.**

Ryder's own records reveal a coordinated pattern: management suppressed a witness statement, delayed investigation until after the promotion decision, then crafted a false narrative for litigation.

**A. The Timeline From Ryder's Own Production.**

July/August 2024: KK reported the threat to Allen Adams. Adams took a written statement and instructed KK: "keep this discussion in this office and do not talk to nobody on the floor about that situation." Ex. N at 96.

August 4, 2024: Plaintiff emailed HR about Delashmit's relationship, naming Adams as the manager who had received reports. Ex. D at 49.

August 8, 2024: HR interviewed Plaintiff. Ex. T at 127–35.

August 13, 2024: Plaintiff forwarded KK's email to HR. Ex. N at 96.

August 28, 2024: Plaintiff applied for the Logistics Manager position. SOF ¶ 71.

September 10–11, 2024: HR interviewed Toms and Adams about the promotion. Ex. W at 149–52; Ex. JJ at 324–25.[3]

September 11, 2024: Allen Adams opened HRC1596991—the case addressing Plaintiff's complaint that Delashmit was selected despite the relationship. Ex. U at 137.

---

[3] After Plaintiff's email about the promotion decision, Toms stated on 9/10/2024 "Jesse H is opening another case. ……...I told Allen to create a case.. See Ex. X at 162. Subsequently, Adams then opened a case that led to Delshmits termination, see EX. S at 120 "GM Allen Adams opened the case against Mr. Delashmit when he learned of the potential conflict of interest. Yet, contemporaneous records would state that prior to August 13,2024 a team lead " went to Allen office again and then i meet him and Melissa in the office and i explain to them what just happen …… Allen give me a statement paper then i write what happen on it. He told me, he's going to handle it and tell me to keep this discussion in this office and do not talk to nobody on the floor about that situation….

September 19, 2024: Delashmit was terminated. SOF ¶ 82.

October 7, 2024: HR closed the Delashmit complaint (HRC1542577) as "unsubstantiated"—despite Delashmit having been terminated eighteen days earlier for the very conduct Plaintiff reported. Ex. S at 118.

October 11, 2024: HR closed HRC1596991, stating: "When the position was posted and interviewed for, this had not been substantiated." Ex. KK at 328.

**B. Ryder's Own Words Contradict Its Own Narrative.**

HR's closure summary states: "GM Allen Adams opened the case against Mr. Delashmit *when he learned* of the potential conflict of interest." Ex. S at 120. The record shows Adams learned no later than early August 2024—before the promotion interviews. He did not open a case then. He instead suppressed the witness statement and participated in selecting Delashmit. He told HR that "both" candidates had leadership backgrounds and that he "was able to rely on both of them when he wasn't around." Ex. JJ at 325. He "agreed with the selection of Mr. Delashmit." *Id.*

**C. The KK Statement Was Requested and Withheld.**

First RFP No. 2 sought "all documents referencing or summarizing any investigation, discussion, or dismissal of allegations made by Plaintiff against Stephen Toms, including ... discrimination." Ex. GG at 281. First RFP No. 3 requested "the full routing history, access logs, and audit trail" for

HR case HR1628508. Ex. GG at 282. Third RFP No. 13 demanded complaints by named employees including Nouvertne and others. Ex. GG at 304–05. Ryder refused all. The KK statement nor HR case notes are not on any privilege log. They were never produced despite being directly responsive to these requests. The KK documents absence from Ryder's production—despite being directly responsive to First RFP No. 2 and not appearing on any privilege log—warrants an adverse inference that its contents would be unfavorable to Ryder's position. See *Bracey v. Herringa*, 466 F.2d 702, 703 (7th Cir. 1972).

**D. The Withheld KK Documentation**

All documentation related to the Delashmit investigation would show what the Whitestown facility knew before the promotion, what was disclosed and to who, and whether HR and Toms had it before the promotion decision. Without it, Plaintiff cannot prove that Adams and Tom's made the promotion decision with knowledge of Delashmit's misconduct. Under Rule 56(d), Plaintiff is entitled to this document before summary judgment is granted.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. Deny Defendant Ryder's Motion for Summary Judgment, or in the alternative, defer ruling pending completion of discovery;

2. Strike the Declaration of Tim O'Brien (ECF No. 162-3) in its entirety, or alternatively, strike paragraphs 5, 7, 8, 9, and 17;

3. Strike the Declaration of Stephen Toms (ECF No. 162-12) in its entirety, or alternatively, strike paragraphs 4, 6, 11, 12, 14, and 17;

4. Order Defendant to respond fully to Plaintiff's outstanding discovery requests;

5. Deem Third RFA No. 5 (Snyder discipline) Admitted

6. Deem Third RFA No. 7 (Employee Lock in) Admitted

7. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Jesse Holloway
Jesse Holloway, Pro Se Plaintiff
9430 Tower Lane
Indianapolis, IN 46235
ariesjackson702@icloud.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of March, 2026, a true and correct copy of the foregoing was served via the Court's electronic filing system on all counsel of record:

R. Evan Jarrold

Rayner Mangum

Constangy, Brooks, Smith & Prophete, LLP

Email: ejarrold@constangy.com

Email: rmangum@constangy.com

*Counsel for Ryder Integrated Logistics, Inc. & Rockwell Automation, Inc.*

/s/ Jesse Holloway
Jesse Holloway
Pro Se Plaintiff